### LOS ANGELES FISHERIES, Inc., v. CROOK. *
### No. 6263.

Circuit Court of Appeals, Ninth Circuit.
March 16, 1931.

*Rehearing denied May 11, 1931.

1032

Francis J. Heney, of Los Angeles, Cal. (L. R. Brigham, of Los Angeles, Cal., of counsel), for appellant.

Edward Hervey, Wm. W. Lovett, Jr., and John McC. Scott, all of Los Angeles, Cal., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

Appellant is a Delaware corporation, organized for the purpose of conducting the business of catching whales in the Pacific Ocean beyond the three-mile limit, and selling the oil obtained therefrom throughout the United States. It is authorized to do business and to sell its capital stock in the state of Nevada. It established an office in the city of Las Vegas in said state, where its first board of directors was elected, and adopted a resolution to the effect that none of its stock should be issued except in the state of Nevada. At this office were located a vice president and an assistant secretary of the corporation who were authorized to issue certificates of stock. Offices were also established in Los Angeles, and the corporation's stock certificate book was kept there, where the directors met from time to time and attended to the business of the corporation which, at that time, consisted of altering and repairing its whaling ship. This was done at San Pedro Harbor, Cal.

The said corporation is not authorized to do business under the laws of California, and has received no permit from the commissioner of corporations of the state of California to do business there.

On September 15, 1928, appellant's treasurer and general manager, Bernard A. Gillespie, called at appellee's office in Los Angeles and then and there engaged in a conversation with appellee relative to a suggested purchase by appellee of certain shares of the capital stock of the appellant corporation. In the course of the conversation, appellee expressed his willingness to purchase 2,500 units of the capital stock of appellant corporation for the price of $25,000. Thereafter, and on the same day, the said Gillespie went with appellee to the First National Bank of Beverly Hills, where appellee borrowed the sum of $25,000 and thereupon delivered the same to the said Gillespie in the form of a cashier's check, which the said Gillespie deposited in said bank to the account of the appellant.

On September 18, 1928, Gillespie notified appellee that he (Gillespie) had been informed by the attorney for the corporation that the attempted sale of the stock was irregular and ineffective, and that it would be necessary for appellee to make application for the stock, that he could not buy the stock that way and would have to sign a letter

which appellee did, as we shall hereafter discuss.

The whaling ship sank on September 21, and about one week thereafter appellee demanded the return of his money, which demand appellant refused.

A jury having been waived, the court's findings of fact were in accordance with the allegations of the complaint. The court found: "That it is true that on or about the 15th day of September, 1928, plaintiff offered to subscribe for Twenty-five Thousand ($25,000.00) Dollars of the capital stock of defendant and on said date paid to defendant the sum of Twenty-five Thousand ($25,000.00) Dollars in full payment for such capital stock. That said offer to subscribe was made in the City of Los Angeles, County of Los Angeles, State of California." And concluded: "That the said offer of plaintiff to subscribe to Twenty-five Thousand ($25,000.00) Dollars of the capital stock of defendant was null and void."

This conclusion was based upon the finding that the entire transaction took place within the state of California, and therefore was void under the following provisions of the Corporate Securities Act of California, chapter 532, St. 1917, as amended (St. 1929, p. 1251):

Section 3: "No company shall sell * *    *; or offer for sale, negotiate for sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

Section 2, subsection 3: "The word 'company' includes all domestic and foreign private corporations. *    *    *"

Section 2, subsection 7: "The word 'security' shall include any note, stock. *    *    *"

Section 2, subsection 8: " 'Sale' or 'sell' shall include every disposition, or attempt to dispose, of a security or interest in a security for value. *    *    * 'Sale' or 'sell' shall also include a contract of sale, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a subscription or an offer to sell, directly or by an agent. *    *    *"

Section 2, subsection 9: "The word 'agent' as used in this act means and includes every person or company. *    *    *"

Section 12: "Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void. *    *    *"

At the trial the following questions were propounded to the appellee and the following answers returned:

"Q. You sent an application to a bank in Las Vegas, Nevada, requesting it to act as your agent in securing the certificates of stock from the corporation, the Los Angeles Fisheries Company, at its office in Las Vegas, did you not? A. I did to this extent—

"Q. That paper has been returned to you, has it not, that letter? A. No sir, it has not.

"Q. Didn't you write a letter to the bank requesting them to return it to you? A. The attorney for the Los Angeles Fisheries wrote a letter, so Mr. Gillespie told me, and brought it in to my office, and said, 'Here is a request for your stock.' This was three days after I had paid my money. I didn't read the letter. I said, 'Well, this makes it okay,' and I signed it and handed it back to him, and he said, 'I am in a hurry to get to the ship-yard, and I will mail it,' and that is the last I ever saw it. *    *    *

"Q. Mr. Crook, you testified this morning something to the effect of a letter having been signed by you addressed to the bank up in Nevada. I will ask you if, from your recollection, you can state whether or not that is a copy of the letter (handing paper to witness)? A. I can only answer that in this way: Mr. Gillespie brought some kind of a letter or document, telling me that his attorney told him that he had pulled a boner, and to sign this and this sets everything straight. He sat down on my desk, and after talking for three or four or five minutes about the progress that was being made with the repair of the boat, he says, 'Well, I am in a hurry to get to the shipyard. Go ahead and sign that, and I will mail it.' And I signed it, and simply said, 'This makes it okay, does it, Barney?' And he said, 'Yes,' and I signed it and did not read it. I couldn't tell you whether this was a copy of it or not.

"Q. Do you recall the substance of it, as to whether it was a request to the bank to act as your agent? A. He didn't say. He says, 'Our attorney says we have pulled a boner. This sets it straight,' and left it in the envelope. And when he told me he had to get down to the shipyard, was in a hurry, and said simply, 'Sign that and I will mail it,' I took it out of the envelope and said, 'Barney, is this okay,' and he said, 'It is,' and I signed it and handed it back to him, and that is the last I saw of that letter. I didn't even read it."

Bernard A. Gillespie, above referred to, testified as follows: "I heard the testimony of Mr. Crook in relation to. what purports to be a carbon copy of a letter dated September 18, 1928, addressed to the First State Bank of Las Vegas, Nevada. I presented a letter to Mr. Crook and asked him to sign it but I couldn't state whether the letter which I now have in my hand is a copy of it. I couldn't tell you what the letter said but I got it out of Mr. Alderman's office out of a form that he had furnished for that purpose. I got the letter on that occasion from Mr. Alderman. It was typewritten when I got it, also an envelope came with it. After Mr. Crook signed the letter I mailed it to the bank in Nevada. I do not remember the date on which I mailed it but I know I mailed it. I had previously told Mr. Alderman that I had $25,000 of Crook's money in the bank out at Beverly. He said that I couldn't do that. That I had pulled a boner and that Mr. Crook would have to make application for the stock. I then told Mr. Alderman that if he would give me the proper form that I would see that Mr. Crook signed it. He then gave me the typewritten letter which I took down to Mr. Crook and told him that I had pulled a boner. That he could not buy stock that way and would have to sign a letter. I told him that if he would sign the letter I would mail it and I gave it to him and he reached out and got a pen over on his desk and signed the letter without even looking at it and he gave it back to me and I mailed it to Nevada. I did not know why this was required but Alderman had told me that I had violated the laws and that he could not take Mr. Crook's money."

After the letter referred to in the testimony of appellee and Gillespie had been mailed to and received by the bank in Las Vegas, Nev., Leo A. McNamee, vice president and director of the appellant corporation and who had charge of the office of appellant corporation in the state of Nevada, wrote the corporation's attorney in Los Angeles a letter on September 21 in which he said:

"Dear Mr. Alderman: First State Bank of Las Vegas, Nevada, Incorporated, has made application on behalf of E. J. Crook for 2500 units of Los Angeles Fisheries, Inc., at $10 an unit. Mr. Crook advises the bank that he has remitted direct to the company in payment of the purchase price. If you know anything about this subscription please send the certificates to us, so we may deliver them to the bank."

To this letter Attorney Alderman replied on September 24 as follows:

"Dear Mr. McNamee: I received yours of the 21st inst. advising that First State Bank has presented an application on behalf of E. I. Crook to purchase 2500 units of Los Angeles Fisheries, Inc. Payment for the stock has been made here.

"I enclose certificates of preferred and common shares in the name of E. I. Crook, each No. 7 and each for 2500 shares. Will you and Mrs. McNamee please sign as Vice-President and Assistant Secretary, deliver the certificates to the bank for forwarding to Mr. Crook, obtain the bank's receipt on the stubs and forward the stubs to me.

"The bank should mail the certificates to Mr. Crook at his address given in his letter of application. If the representative of the bank who handles the matter writes Mr. Crook a letter of transmittal, please caution him not to say that he is forwarding the certificates at the Company's request, for the bank is, of course, acting as Mr. Crook's agent pursuant to his authority to the bank.

"I suggest that the bank's receipt on the stubs be as follows:

"Name (Name of Stockholder)
"By First State Bank
"By (Name of Officer)
"Office. * * *
"Yours very truly, R. L. Alderman."

On the following day Alderman on his own initiative telegraphed McNamee at Las Vegas as follows: "Please hold without action until further advised certificates of stock enclosed my letter yesterday."

He further testified that "at the first meeting of the directors of the corporation, that is, the organization meeting, a resolution authorizing the issuance of stock as I recall, specified that it must be issued only in Nevada. This was done by my advice."

The certificates of stock were never executed or delivered to appellee, but at Alderman's request were returned to him at Los Angeles.

It thus appears from appellee's own testimony that on September 15, 1928, he offered to subscribe for stock of the corporation and actually paid therefor the sum of $25,000. A few days thereafter, on being told by said Gillespie that the corporation's attorney had told him that he (Gillespie) "had pulled a boner" and "to sign this and this sets everything straight," appellee signed the document submitted to him. At the same time he asked, "This makes it okay, does it, Barney?" The document itself does not appear in the record, but there is ample

testimony and documentary evidence of its contents.

This letter was mailed by Gillespie to the First State Bank of Las Vegas, Nev. The uncontradicted evidence in the case shows that appellee by this letter constituted the First State Bank of Las Vegas his agent to make application on his behalf for the 2,500 units or shares of the corporation at $10 a unit, and informed the bank that he had remitted direct to the corporation in full payment of the purchase price. The bank made the application in Nevada where the corporation was authorized to do business, and the latter's agent there informed the office in Los Angeles accordingly and requested that the certificates be forwarded directly to the bank at Las Vegas. The certificates were forwarded, but they were never actually executed or delivered to the bank for forwarding to the appellee. The contract was entered into in the state of Nevada and called for the delivery of the certificates to the bank in that state. It is therefore not governed by the laws of the state of California.

The testimony of the appellee as well as that of Gillespie clearly demonstrates that appellee was informed of the irregularity of the offer to subscribe to the stock in the first instance and of the necessary steps to be taken to constitute a valid subscription. At that time he evidently was desirous of purchasing the stock and was ready and willing to do what Gillespie advised. He asked for no information. He merely inquired whether his signature on the letter or document referred to would be sufficient, in other words "make it okay," and he did not even take the trouble to read the letter. There is no allegation in the complaint and no finding of fraud or deception. There was a voluntary binding subscription for the stock of the corporation entered into in good faith and it is too late now for appellee to claim that he did not read the letter or document authorizing his agent in Nevada to subscribe for the stock.

Contracts are not to be so lightly regarded. "It will not do for him to enter into a contract and when called upon to abide by its conditions say that he did not read it when he signed it and he did not know what it contained."

Appellee claims that the testimony shows a complete transaction in California for the sale and purchase of the stock and fully sustains the finding of the trial court, and that appellant is attempting to prove that such complete transaction by subterfuge was later transformed into a sale of stock in the state of Nevada. The Standard Dictionary defines "subterfuge" as "that to which one resorts for escape or concealment"; there is nothing in the pleading and certainly nothing in the evidence to support the contention that appellant tried to keep anything from the knowledge of the appellee or tried to get him to sign the letter by unfair means.

The case of Pollak v. Staunton, 293 P. 26, 29, relied on by appellee, is not in point. It involved the sale of stock in the state of California. Attention is called to the following significant expression of the Supreme Court in that case: "Plaintiff at no time authorized defendant Staunton, as his agent, to accept delivery of the 100,000 shares for him in Reno, Nev., on December 28, 1925, or at any other time."

In the instant case, as we have seen, appellee did authorize the bank in Nevada as his agent to subscribe for and receive the stock in that state, thus disregarding entirely, as he had the right to do, the oral negotiations he had with the corporation in California.

The fact that the transaction took place in Nevada makes it unnecessary for us to consider the other phase of the case, whether the state of California could legally declare void the sale of stock within its borders by a foreign corporation without an express permit for that purpose.

Appellee contends that in any event there was no acceptance of appellant's subscription, but it seems to us that the record shows a completed transaction including the payment of the purchase price of the stock. "Nothing remained to be done but the formal issuance of the certificate, upon which the ownership of the stock did not depend." Garretson v. Pacific Crude Oil Co., 146 Cal. 184, 79 P. 838, 840. "To effectuate an issue of stock, it is not necessary that a certificate issue." 5 Fletcher Cyclopaedia of Corporations, paragraph 5740. There is no conflict in the evidence which would justify this court in following the rule announced in the case of Waer v. Waer, 189 Cal. 178, 207 P. 891, cited by appellee.

We are of the opinion that the court erred in rendering judgment for the appellee on the theory that the contract is governed by the laws of California. The cause is reversed, with instructions to grant a new trial.