### In re MOTOR PRODUCTS MFG. CORPORATION.

### MOORE v. JAHNS et al.

### No. 8170.

Circuit Court of Appeals, Ninth Circuit.

Aug. 3, 1936.

Harry J. Miller and Craig & Weller, all of Los Angeles, Cal., for appellant.

Gibson, Dunn & Crutcher, H. F. Prince, J. C. Macfarland, Keith Bullitt, and George D. Jagels, all of Los Angeles, Cal., for appellees.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by the trustee in bankruptcy of Motor Products Manufacturing Corporation, hereinafter called the "Bankrupt," from a decree of the District Court which confirmed an order of the referee allowing a claim against the bankrupt in the sum of $60,953.49, filed by appellees W. H. Jahns and Margaret J. Jahns. The claim is based upon certain debenture bonds issued by the bankrupt to the appellee W. H. Jahns. It was disallowed by the trustee on the ground that the debentures were issued contrary to the provisions of the California Corporate Securities Act, Cal.St.1917, p. 673, as amended, and hence were void. That issue is the only one before us on this appeal.

The bankrupt is a corporation of the state of Missouri. It operates in that state a plant for the manufacture and repair of automobile parts. Four of its five directors are residents of that state. The fifth director, W. B. Huber, is a resident of Los Angeles, Cal. At all times material in this case Huber has been the actual manager and guiding spirit of the bankrupt.

In 1925 Huber purchased from W. H. Jahns the entire capital stock of a California corporation, also engaged in the manufacture of automobile parts, which corporation owned a plant and equipment in Los Angeles. As a part of the consideration for this transfer, Jahns took a chattel mortgage upon the Los Angeles plant and equipment. Subsequently all the assets

of this corporation were transferred by Huber to the bankrupt. The bankrupt then moved its principal office to Los Angeles, but continued operating the Missouri plant.

Beginning in July, 1930, negotiations were had between Huber and one Garrigues looking to a consolidation of the bankrupt with another corporation, the Security Manufacturing Company, which latter owned an automobile plant in Los Angeles. The Security Company was controlled by Garrigues. The chief obstacle to the consummation of the plan of consolidation was the necessity of obtaining the consent of Jahns who held the mortgage on the Los Angeles properties of the bankrupt. In October, 1930, the discussions between Huber, Garrigues, and Jahns bore fruit in a contract executed between bankrupt, the Security Company, and Jahns, in Los Angeles. This agreement provided that Jahns would release the mortgage on the Los Angeles plant and receive in return therefor sixty debentures at $1,000 par value, such debentures to be issued by the bankrupt. The contract expressly provided certain features that the debentures would have to contain. The Security Company was to receive some of the same issue. It was stipulated that the California Trust Company, a California corporation, would act as trustee for the debentures.

Pursuant to this contract, a directors' meeting of the bankrupt corporation was held in St. Louis, Mo., on December 16, 1930. The directors approved the trust indenture proposed by Huber under which the debentures were to be issued, and authorized the issuance of the debentures in the aggregate amount of $150,000.

Thereafter the indenture and the debentures were signed and attested in St. Louis by the bankrupt's secretary; mailed to Los Angeles and signed by Huber, president of the bankrupt; and thence passed over to the California Trust Company, which executed the indenture and authenticated the debentures. The corporate seal of the bankrupt was affixed to the debentures, but it is not certain whether this was done by Huber, in Los Angeles, or by the secretary, in St. Louis.

· After the execution by the California Trust Company, the debentures were sent to the Mississippi Valley Trust Company, in St. Louis, with instructions to forward them to the bankrupt's secretary. At the same time Jahns' mortgage was sent to the Mississippi Valley Trust Company. On January 17, 1931, the bankrupt's secretary, acting on behalf of the bankrupt, delivered to the Mississippi Valley Trust Company, acting as agent for Jahns, debentures in the amount of $60,000. At the same time Jahns' mortgage was surrendered to the bankrupt's secretary. Thereafter the Mississippi Valley Trust Company forwarded the debentures to Jahns in Los Angeles.

Had the securities been issued in California, they would have been void for lack of a permit to issue by the state corporation commissioner. No question is raised in this case as to the validity of the debentures under the law of Missouri, the place of their issue. Apart from the absence of a California permit, the effect of which absence is the question to be decided on this appeal, there is no evidence that the debentures or the trust instrument securing them violate in any respect either the letter or purposes of the California Corporate Securities Act. The master found, and his finding is fully supported in the evidence, that the parties intended no evasion of California law.

The California Corporate Securities Act, at the time in question, provided that:

"No company shall sell * * * or offer for sale, negotiate for sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do." Cal.St.1917, c. 532, § 3, p. 675.

"Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void." Cal.St.1917, c. 532, § 12, p. 679.

" 'Sale' or 'sell' shall include every disposition, or attempt to dispose, of a security or interest in a security for value. * * * 'Sale' or 'sell' shall also include a contract of sale, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a subscription or an offer to sell." Cal.St.1917, c. 532, § 2, subd. 7, p. 674 (as amended and renumbered section 2, subd. (a), par. 8, by Cal.St.1929, p. 1252).

The question before us on this appeal is whether the above-quoted sections of the statute render unenforceable in California bonds issued in Missouri by a Missouri corporation, when the recipient of the bonds is a resident of California and when the bonds are issued pursuant to a contract and a trust indenture both executed between the corporation and the recipient in California.

■ So far as the mere issuance of the bonds is concerned, we consider it well settled that such bonds represent binding obligations in California if their issuance was a valid transaction under the law of Missouri. No part of the California Corporate Securities Act purports to govern or attach consequences to the issue or sale of securities in other states. Appellants cite a host of California cases, but in none of them has it been intimated that the statute seeks to attach such consequences to obligations incurred without the state.

■ On the contrary, California adheres to the general rule announced in Mutual Life Ins. Co. v. Liebing, 259 U.S. 209, 214, 42 S.Ct. 467, 66 L.Ed. 900, that a contract valid where made is valid everywhere. Fenton v. Edwards & Johnson, 126 Cal. 43, 46, 58 P. 320, 46 L.R.A. 832, 77 Am.St.Rep. 141; Mercantile Acceptance Co. v. Frank, 203 Cal. 483, 485, 265 P. 190, 57 A.L.R. 696; Hohn v. Peters, 216 Cal. 406, 14 P. (2d) 519.

■ California also adheres to the general rule that an obligation evidenced by an instrument is created at the place of the delivery of the instrument. Navajo County Bank v. Dolson, 163 Cal. 485, 489, 126 P. 153, 41 L.R.A.(N.S.) 287.

■ While we are aware of no California cases squarely in point on the factual situation here presented, the case of Pollak v. Staunton, 210 Cal. 656, 662, 293 P. 26, 29, contains an inference supporting the view we have taken. In that case, plaintiff, a California resident, sued to recover from defendants the proceeds of plaintiff's stock sold by defendants to third parties. The basis of the recovery sought was fraud. The fraud charged was that the defendants had misrepresented to plaintiff that they had paid in some money to a Nevada corporation in which corporation plaintiff had an option to purchase 100,000 shares of stock; the purpose of the payment, they said, being to provide the money for plaintiff to take up his option. The certificate of 100,000 shares was exhibited to plaintiff in California, who indorsed it and returned it to defendants. Among other things, the court held that the issuance of the 100,000 shares was void because no permit was obtained from the California corporation commissioner. The court was careful to point out that the shares were issued in California, saying: "Plaintiff at no time authorized defendant Staunton, as his agent, to accept delivery of the 100,000 shares for him in Reno, Nev., on December 28, 1925, or at any other time."

The Pollak Case was cited and relied upon by this court in a case directly in point with the one before us. Los Angeles Fisheries v. Crook (C.C.A.9) 47 F.(2d) 1031, 1035. There a Delaware corporation owned a whaling ship operating out of California ports and maintained an office in Los Angeles, where its directors met and its stock book was kept. It also had an office in Las Vegas, Nev., whence all its stock was issued, pursuant to the law of Nevada. Plaintiff, a resident of California, sought to purchase $25,000 worth of stock from an officer of the corporation in Los Angeles. The money had been paid over in Los Angeles, when the officer informed plaintiff that he (the officer) had made an error, and that it would be necessary for plaintiff to sign a letter addressed to Las Vegas, Nev. The letter so sent was a request to the Nevada office to issue stock to the plaintiff. Plaintiff was unaware of the nature of the letter, saying he signed it because the officer told him that signing it was necessary to make everything right. In response to the letter, the Nevada office issued the stock in plaintiff's name and sent the certificates to a Nevada bank which forwarded them to plaintiff in California. Plaintiff later sued to recover the price of his stock, claiming the issue was void because issued without a permit from the California commissioner. In rejecting the contention, this court said: "The contract was entered into in the state of Nevada and called for the delivery of the certificates to the bank in that state. It is therefore not governed by the laws of the state of California." Los Angeles Fisheries v. Crook, 47 F.(2d) 1031, 1035.

There has been no change in the law of California since the Los Angeles Fisheries Case was decided. On the contrary, the case of Gillis v. Pan American Western Petroleum Co., 3 Cal.(2d) 249, 44 P.(2d) 311, 313, supports, by inference, the Pollak Case. In holding that a foreign corporation must obtain a permit to issue shares of its capital stock in California, as against the contention that the issuance of capital stock was an internal corporate matter to be governed by the law of the corporation's domicile, the court said: "The laws of the several states authorize different capital stock structures for corporations, and under the doctrine of comity they are al-

lowed * * * to enter other states for the purpose of doing business, regardless of whether a corporation with like structure is permitted to be formed in the latter states. However, these authorities are far from holding that the issuance and sale of the stock in a state other than that in which the corporation is formed is not a proper subject for legislative action. A number of authorities by their conclusions confirm the right of the state to protect its citizens, by legislative interposition, against the issuance or sale of stock *in the state."* (Italics supplied.)

The trustee cites many cases from California and elsewhere holding that persons may not do indirectly what they are prohibited from doing directly and that courts will prevent evasion of law by devious indirection. To apply these cases here assumes the issue in dispute. The bankrupt and Jahns evaded or violated no law, directly or indirectly, unless it is unlawful, under the circumstances disclosed in this case, to issue securities in another state without the permit of the California corporation commissioner.

The trustee argues that the issue of the debentures in Missouri must be held void because the transactions leading up to the issue, including the execution of the contract between the bankrupt, the Security Company, and Jahns, providing for the issuance of debentures, and the execution of the trust indenture, were all consummated in California.

So far as the trust indenture is concerned, there is nothing in the statute which requires a permit from the commissioner before a trust indenture providing for the issuance of securities can be executed in California. If it is lawful to issue bonds in Missouri without a permit from the California commissioner, an indenture authorizing such bonds is lawful, regardless of the place of its issue. No obligations arise under the indenture until the bonds are issued.

Apart from statute, on the same general principles a contract executed in California providing for the future creation of bond obligations, which obligations are enforceable in California, would have no taint of illegality in California. The only question, therefore, is whether the execution of such a contract is prohibited by section 3 of the act which provides that: "No company shall sell * * * or offer for sale, negotiate for sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

As above stated, we are without the benefit of any decisions relative to the application of the statute to situations such as the one before us by the California courts. We are therefore constrained to follow our own previous holding in Los Angeles Fisheries v. Crook, supra, where all the negotiations for the sale of stock were had in California and the consideration for the stock paid in California, but where the delivery of the stock was had in Nevada, and it was held that the law of California did not govern the issuance of the stock.

Without seeking comprehensively to interpret the section of the Corporate Securities Act just quoted, we believe that the bankrupt in entering into the contract in Los Angeles did not "offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue" within the meaning of the statute. In the first place, the provision appears clearly to distinguish between a *sale* and an *issuance* of securities. To issue bonds is not to sell anything; it is rather to create an obligation to pay money in the future. Hence, if the contract falls within the purview of the section, it must come under the clause which prohibits the issuer to "take subscriptions for any security of its own issue." To contract to issue bonds not yet in existence or defined, even though the contract specifies some of the terms of the bond obligations to be later created, does not constitute the taking of subscriptions to the bonds. A holding to the contrary would mean that parties could never negotiate or contract in California regarding the future issue of securities without obtaining the permission of the commissioner so to negotiate or contract. And this would be true, under such an interpretation, even though the negotiations or the contract expressly contemplated that the future issue of securities would be had only on the obtaining of a permit from the California commissioner.

We see no reason to modify or alter the holding of this court in Los Angeles Fisheries v. Crook, supra. Hence that decision controls this appeal.

Affirmed.