[S. F. No. 15674. In Bank.—June 2, 1938.]

## A. S. HOLMES et al., Appellants, v. ROBERT E. HATCH, Respondent.

[S. F. No. 15736. In Bank.—June 2, 1938.]

## A. S. HOLMES et al., Respondents, v. ROBERT E. HATCH, Appellant.

Morrison, Hohfeld, Foerster, Shuman & Clark for Plaintiffs and Appellants.

Robert E. Hatch, *in pro. per.*, and Hatch & Mahl for Defendant and Appellant.

THE COURT.—We are here confronted with consolidated cross-appeals from a judgment entered in favor of plaintiffs and against the defendant Hatch in the sum of $15,000. In the briefs filed in support of their judgment roll appeal the plaintiffs request that we direct the trial court to enter judgment for the full amount of $21,100 prayed for in the complaint, while the defendant upon his appeal, prosecuted under the alternative method, seeks a reversal of the judgment as entered. In passing, it should be stated that the cause was tried as to the defendant Hatch alone and we need not now

concern ourselves with the other defendants named in the complaint.

Briefly stated, the record discloses that in December, 1930, a corporation, referred to herein as Hub, Ltd., entered into a sublease or drilling agreement by which it undertook to continue and complete the drilling of a partially sunk oil bore on certain land in the Signal Hill area. As consideration therefor it was to receive 56 per cent of the oil and gas produced. The lease or drilling agreement contained a forfeiture clause in the event of default by Hub, Ltd., at any time for a period of ten days. In order to finance its operations under the drilling agreement Hub, Ltd., sold to the general public, including plaintiffs' several assignors, certificates representing royalty interests in and to the proceeds of the expected production of the well. Plaintiffs' assignors, with subsequent contributions, invested $21,100, the amount here in litigation. As indicated, others similarly invested. ■ Unknown to the purchasing public, the certificates representing such royalty interests were sold without first procuring a permit from the commissioner of corporations. This fact, however, is not inimical to the rights of the plaintiffs in this litigation. (*Western Oil Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271].)

The money so invested by the purchasers of royalty interests proved inadequate to complete the well and place the same on production. It was while Hub, Ltd., was in this plight that the defendant Hatch came on to the scene. His first connection or association with Hub, Ltd., or the well, was in a representative capacity. As counsel for one of the royalty interest purchasers or unit holders, he was engaged to investigate conditions. He soon discovered the uncompleted condition of the well and the financial status of Hub, Ltd. As a result of his association with the officers of Hub, Ltd., and others in charge of the well, he was induced to interest himself personally in the well by advancing money to insure its completion. There is a conflict in the record as to what he was to receive for putting his money into the well. He testified, in substance, that he agreed to invest in the well upon the promise of Allen, the then president of Hub, Ltd., that he would arrange with the unit holders to procure for him a percentage interest in the production of the well when completed. Admittedly nothing came of the asserted endeavor to arrange a percentage interest for the defendant in

consideration of his money advances. Allen, on the other hand, testified that as president and director of Hub, Ltd., he attempted to interest the defendant in the well, discussing with him the assets and liabilities of Hub, Ltd., and pointing out to him that the machinery and equipment on hand was worth approximately $18,000. Allen denied that he discussed or agreed with the defendant that he would communicate with and arrange for the unit holders to grant or contribute to the defendant sufficient units to insure him one-half or any other proportion of the interest Hub, Ltd., had in the production of a completed well. On the contrary, Allen testified that they did not discuss the matter of his communicating with the unit holders but that in consideration of a transfer of all of the assets of Hub, Ltd., together with a few unsold units or royalty interests, not to exceed six or eight "percents", and worth $1500 a "percent", the defendant agreed to and did advance several thousand dollars to complete the well. The witness denied stating to the defendant, as the latter testified, that it was impossible to get financial assistance elsewhere or that if the defendant refused to help, the well would be abandoned.

Allen's testimony in this respect is corroborated by that of Terry, who preceded him as president of Hub, Ltd., in that he testified that in a conversation with the defendant, the defendant's oil expert and admitted agent Young, and Allen, in October, 1931, Young stated that he had made a physical examination of the properties and was satisfied "The territory offered a fair chance of getting a good well", whereupon the defendant inquired as to the number of units or "percents" he would be guaranteed in the event he decided to advance the necessary money to complete the bore and place the well on production. In response to this query, Allen, according to the witness, replied that six and possibly eight "percents" would be furnished. At this same conversation, the witness testified, one of the parties stated that the equipment was worth $21,000 or more. Hatch agreed to come in. Several days later, the defendant asked the witness to assist Allen in gathering the units that were to make up the six or eight "percents" he was to receive. This witness also testified that the equipment at the well cost "around $19,000". These two witnesses likewise fixed the market value of the drilling agreement held by Hub, Ltd., as of the time the defendant interested himself in the situation, in excess of $40,000.

The plaintiff Holmes testified that when talking with the defendant at or about the time the latter was interesting himself in the well, the defendant fixed the value of the equipment at approximately $15,000. Defendant denied any such statement and offered other testimony that the equipment was worth $7,500.

As stated above, the defendant agreed to finance the completion of the well whereupon all of the outstanding stock of Hub, Ltd., viz., three qualifying shares, were endorsed in blank and left with the defendant. The resignation of all officers of Hub, Ltd., followed. In a letter addressed to the unit holders in which defendant suggested a reorganization, he pointed out that the oil experts were "optimistic as to the success of this well". A new corporation, referred to herein as Hub corporation, was then formed by the defendant. Defendant was listed on letterheads as the president thereof. Other than the filing of articles of incorporation, nothing was done in the organization of the new corporation. It issued no capital stock. Hub, Ltd., thereupon assigned its drilling contract or sublease to the new corporation, the consideration therefore being the money advanced and to be advanced by the defendant for drilling operations. Thus the assets and equipment of Hub, Ltd., came into the possession and control of the defendant.

Within the next few months the defendant testified that he advanced in the neighborhood of $50,000, or more, but failing to receive any cooperation from the unit holders in the way of a percentage in the contemplated production, he refused to make further advances. Other than his own assertion, the defendant offered no proof as to the extent of his advances for upon the trial, and here, he frankly states that he has written off the venture as a loss and waives all claim for any and all such advances. Whether for lack of the desired cooperation, or otherwise, the drilling operations terminated in less than three months after the defendant came into the venture. Thereupon and for violation of its forfeiture provisions, the drilling agreement or sublease running to Hub, Ltd., and assigned, as indicated, to the new corporation, was terminated by the lessor. While on the stand, the defendant admitted that though previously in touch with plaintiffs' counsel in an effort to adjust their rights or differences, he did not notify them in December, 1931, that drilling operations had ceased or that there had been a forfeiture under the sublease. He

asserts that he was unable to locate the unit holders. Eight days subsequent to the forfeiture of the drilling agreement, a new, and practically identical, drilling agreement or sublease was granted by the lessor to the defendant's brother-in-law, who admittedly was a mere "dummy" in the transaction. Following execution of the new sublease, the defendant concededly made further advances of money which served to complete the well and to place it on production. Defendant testified that the proceeds derived from the sale of the production of the well were deposited in a trustee account standing in the name of his brother-in-law. At no time during the trial, however, was any effort made by the defendant to account for the production of the well or the proceeds derived therefrom. This matter shall be more fully treated at a later point in this opinion.

Under date of January 2, 1932, the defendant addressed a letter to the unit holders, or those he could locate, in which he reviewed the troubled financial history of the well, the default and forfeiture under the original sublease and the granting of a new sublease to "another party". The letter failed to disclose defendant's relationship or business connection with such other party. He attempted to explain this by stating that he was not the real party in interest but the record fails to support such an explanation. Allen, who was president of Hub, Ltd., when defendant personally interested himself in the well, and the plaintiff Holmes testified, respectively, that they did not learn of the forfeiture under the original sublease until seven or ten days after it had occurred. The former stated that it came out of a "clear sky".

In addition to the conflicts in the testimony herein specifically mentioned, there were others which we find it unnecessary to here discuss. They were matters for the trial court to resolve. Following a protracted trial wherein the history of the well was developed with much more detail than we have here attempted, the trial court, apparently in an effort to do justice to all parties who had put money into the well, by means of a memorandum opinion, intended to guide counsel in the preparation of findings and an interlocutory judgment, indicated that he was of the view that a money judgment should not be entered against defendant, that no actual fraud was committed by the defendant in connection with the taking of the new sublease but that as a result of the taking of such new sublease a trust in the returns from

the production of the well existed in favor of all the unit holders and the defendant in proportion to their interests therein. It was then indicated that an accounting was indispensable to a determination of such relative interests and that the interlocutory decree should so provide. As part of the interlocutory decree entered approximately six months later, it was found, among other things, that the purported transfer of the property and assets of Hub, Ltd., to the successor Hub corporation was of no force and effect because the organization of the latter corporation was never completed and it was therefore without capacity to receive a conveyance; that said property and assets were, and since October 2, 1931, had been, in the sole possession and control of the defendant, who since that time has owned and controlled Hub, Ltd.; that defendant's conduct in the premises has not been motivated by an actual fraudulent intent; and that an accounting was necessary as to the amount of money and property received by defendant from the sale or other disposition of the oil, gas and other petroleum products derived from the well, the amount of money expended by defendant in completing and operating the well, the aggregate sum paid by the unit holders and the amount of unpaid claims. It was thereupon concluded that plaintiffs were entitled to a judgment against the defendant decreeing that as creditors of Hub, Ltd., they were entitled to repayment of their $21,100 out of a proportionate share of the net proceeds of the production of the well available under the sublease, such proportionate share being expressed by a fraction, the numerator of which was the sum of $21,100 and the denominator of which was the total of all moneys paid or advanced by all unit holders plus the advancements of defendant for the completion and operation of the well. It was also concluded that the judgment should decree that defendant should "account to plaintiffs, and is indebted to plaintiffs for plaintiffs proportionate share" of the proceeds of the oil, gas and other petroleum products received by the defendant under the sublease, and decreeing that "defendant . . . shall thereafter be liable to plaintiffs and shall account to plaintiffs as Trustee, for plaintiffs proportionate share" as above specified; and "that plaintiffs are entitled to an accounting from defendant", with respect to all moneys or property paid into or received by him from the well. The interlocutory decree thereupon ap-

pointed a referee and directed the defendant to ''render a full account'' as detailed in the findings and conclusions.

One year subsequent to the entry of the interlocutory decree, the trial was reopened pursuant to plaintiffs' motion. Defendant consented thereto. This was done because of defendant's failure in the *interim* to account as required and in view of the death of the referee prior to the filing of his report. Upon further proceedings before the court it had been made to appear that a further reference would serve no useful purpose whereupon plaintiffs caused the trial to be reopened ''in order to put the case in final shape so that your Honor can now enter whatever decree appears to your Honor to be appropriate'' and so that defendant ''could present any accounting or figures he might care to present, or so that [plaintiffs] could ask him to do so, if he did not wish to do so voluntarily''. At this hearing the defendant in open court waived any and all rights to reimbursement for the advancements made by him. In the ensuing discussions and while again on the witness stand the defendant denied receiving any of the proceeds from the well and stated that he never had or possessed any books or records or the log of the well that would permit him to account.

Approximately six months later and after he had been served with proposed findings of fact and conclusions of law upon which a final judgment was to be entered against him, the defendant moved the court to permit him to produce the records which he had previously failed to do ''because of the heavy time and expense which would be entailed to him in getting the necessary data''. This tardy offer to account was properly rejected and the motion was denied. Thereafter the court signed and filed its findings of fact and conclusions of law, to which the defendant proposed no amendments, in which in great detail it again traced the history of the well, specifically finding that defendant's conduct and activity in connection therewith was intended to hinder and defraud the creditors of Hub, Ltd., that the defendant conceived the idea and design of causing a default under the sublease or drilling agreement and of the issuance of a new and similar agreement to his dummy or agent, in order that he might thereby be enabled to acquire all of the property and assets formerly belonging to Hub, Ltd., having a market value of $50,000, and thus extinguish all of the rights of the unit holders, including those of plaintiffs' assignors, for his own sole use and benefit

and without making payment therefor or rendering any accounting; that the defendant "has refused to give to this court any accounting" of the property and assets so acquired or of the production of the well from which "large quantities of oil and gas have been produced"; and that defendant has kept no records of such production or of the proceeds derived therefrom and is unable to account therefor.

We cannot agree with defendant's charge that the judgment is, in effect, a "penalty" judgment imposed solely because of his failure to account and is without any support in the record. Nor can we accept his statement that he neither "wilfully failed nor refused to account while either believing, or having reason to believe, that he was required to do so". During the early stages of the trial and in response to defendant's announced inability to "understand the purpose" of "any talk about an accounting in a suit for money", plaintiffs' counsel stated that in his opinion "there are available two possible different forms of relief which the court conceivably could grant to the plaintiffs", viz., to treat the action as one "at law in which a money judgment against you can be rendered for the amount of our claim at least, to the extent of the value of the assets which you took there, or of which you assumed control of, from Hub Petroleum Corporation, Ltd.", or as an action "for general equitable relief" wherein the court might "entertain the view that this entire situation should be taken up by the four corners and looked at in the larger aspect, and perhaps some accounting should be made that will give some recognition to the money you have put into this thing, and will give some recognition to the money that the plaintiffs have put in". Defendant expressed his appreciation of counsel's explanation. It is thus apparent that defendant during the trial was fully informed as to the likelihood of a money judgment or a judgment for a proportion of the proceeds following an accounting thereof. At the conclusion of the evidence, the court below, as already stated, in an effort to do justice to all concerned suggested in its memorandum opinion that the latter course appeared to be the equitable one for it made due allowance for the investments and advancements of the unit holders and the defendant and in furtherance thereof the interlocutory judgment thereafter entered directed the defendant to account in the particulars mentioned earlier in this opinion.

His failure so to do, which we have already recounted, left the trial court no alternative but to enter a personal judgment against the defendant. Upon defendant's refusal to account as directed, the court might well presume that the evidence, if produced, would operate to his prejudice. (*Bone* v. *Hayes*, 154 Cal. 759, 765 [99 Pac. 172].) In *Wright* v. *Salzberger*, 121 Cal. App. 639, 644 [9 Pac. (2d) 860], it is declared that "Where property alleged to have been fraudulently conveyed is shown to have been sold by the grantee or converted to his own use a personal judgment for the value thereof may be entered". See, also, *Swinford* v. *Rogers*, 23 Cal. 234, 237,

■ Contrary to the defendant's contention, we are satisfied that the complaint states a cause of action. It was not necessary that plaintiffs' claims be first reduced to judgment against Hub, Ltd. (*Blanc* v. *Paymaster Min. Co.*, 95 Cal. 524, 532–534 [30 Pac. 765, 29 Am. St. Rep. 149].) ■ We are likewise satisfied that the evidence supports the findings. In fact, defendant's assaults on the findings and the evidence underlying them are, to say the least, most general and indefinite and are advanced with but slight reference to the record.

■ The presence of certain inconsistencies in defendant's testimony, not necessary to be here detailed, coupled with his later refusal or neglect to account as directed, when considered with the further fact that the trial was reopened, by agreement of counsel, for the taking of additional evidence, at which further hearing the defendant for the first time asserted that he was not the real party in interest but that there had been put into the well certain of the money of Young, his previously admitted agent, which testimony was contrary to defendant's earlier testimony that the money advanced was his "own personal funds", and finally, when it is recalled that the defendant offered to produce the records, etc., when served with proposed findings and confronted with the spectre of a final judgment against him, we have no hesitancy in stating that the court below acted reasonably and within the record when it concluded, in the *interim* between the entry of the interlocutory judgment and the final judgment, that defendant in his acquisition of the assets of Hub, Ltd., was not motivated by the high ideals originally attributed to him. In other words, all the facts were not before the trial court at the time it filed its memorandum opinion and its interlocutory

judgment. Under all of these circumstances, neither was final or binding. (*Montecito Valley Water Co.* v. *Santa Barbara*, 144 Cal. 578, 595 [77 Pac. 1113]; *Wadleigh* v. *Phelps*, 149 Cal. 627, 645 [87 Pac. 93]; *Doudell* v. *Shoo*, 159 Cal. 448, 454 [114 Pac. 579]; *Gunder* v. *Gunder*, 208 Cal. 559, 561 [282 Pac. 794].) In the recent case of *McAllen* v. *Souza*, 24 Cal. App. (2d) 247 [74 Pac. (2d) 853] (hearing denied here), it is stated: ''We are dealing here with an interlocutory judgment ordering an accounting which differs from certain other types of interlocutory judgment known to the law. The interlocutory judgment here was not final in any sense of the word . . . it required no findings to support it . . . and any findings or conclusions made at the time of the entry thereof were subject to change or modification at the time of entry of the final judgment.''

We are not inclined, upon plaintiffs' judgment roll appeal, to direct the court below to increase the judgment from $15,000 as entered to $21,100, the amount prayed for in the complaint. While it is true the court found that the assets of Hub, Ltd., had a reasonable market value of $50,000, it may well have concluded, when confronted with defendant's refusal to account, and with due deference to other creditors and unit holders not before it, that plaintiffs under all of the circumstances disclosed by the record, should have judgment for a part only of their claim.

We address ourselves now to defendant's motion for ''enlargement of record'', which motion was made after submission of these cross-appeals. By his motion the defendant seeks to have incorporated into the record now before us the judgment roll in another action, prosecuted in another county, by unit holders other than those now before us. He seeks to include the same on the ground that though the causes assertedly involve identical issues they present irreconcilable judgments. We have been furnished with the judgment roll alone in the cause sought to be incorporated. The evidence there adduced is not now before us and we perceive of no good reason why the cause of the plaintiffs herein should be influenced or governed by the ability or lack of ability of persons similarly situated to prosecute their claims against the defendant. It might be said that it was defendant's refusal to account that precluded the trial court in the present cause from entering a judgment for the plaintiffs, as in the other

case, for their proportionate share only of the proceeds derived from the production of the well. In the cause sought to be incorporated the subject was covered by stipulation of the parties. The two causes are not dependent one on the other, as was the situation in *Sewell* v. *Johnson,* 165 Cal. 762 [134 Pac. 704, Ann. Cas. 1915B, 645], relied on by the defendant. As pointed out in the cited case, the judgment there sought to be incorporated "was the sole foundation of plaintiff's action". Such is not the situation here presented. Plaintiffs' action and judgment are self-sufficient and may stand regardless of the prosecution by other unit holders of their claims. In addition, the motion to incorporate is slightly at variance with defendant's statement made early in the trial that he looked upon the present cause, which antedates the one now sought to be incorporated herein, "as a sort of test case which will be very useful in determining the rights of not only the parties to the immediate action, but other interest holders". ■ Moreover, the rule of the Sewell case, *supra,* relied on by the defendant, is one of "expediency, to be applied or refused application as the equities and justice of the case require". (*City of Los Angeles* v. *Abbott,* 217 Cal. 184, 193 [17 Pac. (2d) 993].) Inasmuch as the defendant's refusal to account precluded the trial court from decreeing that plaintiffs recover their proportionate share of the proceeds of the production of the well from the defendant, as trustee thereof, as was decreed in the cause sought to be incorporated, and inasmuch as the defendant in challenging the propriety of this form of relief, as suggested by the trial court herein in its memorandum opinion, declares in his opening brief herein "that the proposed trust was illegal", we fail to perceive wherein the equities or justice of the situation make it expedient for us to now give heed to the findings and judgment of another court, in a different action, between different parties, wherein such asserted "illegal" form of relief was granted.

We have noted other contentions of the parties. They do not require discussion here. What we have said sufficiently disposes of the appeals. Defendant's motion for a new trial was properly denied.

The motion for "enlargement of record" is denied and the judgment is affirmed.