[Civ. No. 11698. First Dist., Div. One.—June 23, 1941.]

PAUL W. SCHWARZ et al., Respondents, v. ROBERT E. HATCH et al., Appellants.

Robert E. Hatch, *in pro. per.*, and Decoto & Hardin, J. Meredith Wortz, Preston & Preston, Carl Conradi, Jr., and Charles H. McDonald for Appellants.

Thos. C. Ryan and Geo. F. Snyder for Respondents.

BRAY, J., *pro tem.*—Appeal on the judgment roll alone from a judgment in favor of plaintiffs in the sum of $1617.60, which amount the court found due from defendants to plaintiffs as their share of the proceeds from oil produced by the "Hub No. 1" well at Signal Hill. Defendants had cross-complained for the sum of $65,000 for moneys alleged to have been paid by defendants to and for the benefit of plaintiffs. The court found against this claim, both upon the merits and because of the statute of limitations.

The findings of fact evidently were carefully drawn and considered and disclose the following facts: The owners of certain oil bearing property in 1930 executed a lease of the property to one Newton. Newton then executed a drilling contract or sublease to a corporation called Hub Petroleum Corporation, Ltd. (hereinafter referred as "Hub Ltd."), under which the corporation was entitled to retain 56 per cent of all oil produced, the balance of the oil belonging to Newton and the landowners. Only three shares of the capital stock of Hub Ltd. were ever issued. Before the defendants came into the picture, one share was owned by Lewis Jones, drilling superintendent of the well; one share by George C. Terry, then president of the company; and one share by Verner Allen. Allen was one of four partners of a securities firm called Sanborn & Co., which was employed by Hub Ltd. to sell certificates of the corporation, which certificates will be discussed in detail later as they are the basis of plaintiffs' claims herein. In August, 1931, Allen

replaced Jones with one Douglas as drilling superintendent, and from that date on Hub Ltd. did not function as a corporation except by and through Allen and Douglas. From then on the three shares of stock stood in the names of dummies and were endorsed in blank.

Hub Ltd. had no assets except the drilling contract or sublease from Newton, requiring the company to drill for oil and giving it 56 per cent of all oil or gas produced. To raise money to carry on the necessary drilling Hub Ltd. issued and sold, through Allen's firm, certificates entitled "Assignment of Royalty Interest in Hub Petroleum Corporation, Ltd." These certificates set forth that the holder was assigned an undivided certain per cent (depending upon the amount purchased) "Over-Riding Royalty Interest in and to the proceeds of the total gross production of the oil, gas or other hydrocarbon substances produced, saved, or sold from that certain well known as Hub No. 1, now being drilled" on the leased property. There was a provision that the Over-Riding Royalty Interest covered by the particular certificate "shall be subject to the expense for upkeep and maintenance in the amount of Eight ($8.00) Dollars per month per one (1%) per cent payable out of oil only, and the said Hub Petroleum Corporation, Ltd., reserves this amount to itself for this purpose, *this interest not being otherwise subject to any assessments* other than pro rata share of taxes." Then follows the clause upon which plaintiffs mainly rely: "It is mutually understood and agreed that this assignment constitutes a purchase of said interest herein specified, and *that said assignment is not an agreement of co-partnership; and that said assignee is not in any way obligated to pay any of the costs of drilling said well, nor shall assignee be responsible for any debts incurred in and about the drilling or operating of said well."* (Italics added.)

Prior to August 27, 1931, Hub Ltd. had sold and delivered to various persons (hereinafter referred to as the "certificate holders"), certificates of this type totalling the entire 56 per cent of the prospective production which the Hub Ltd. owned. These certificates constituted the only written or oral agreement between the company and the certificate holders. Plaintiffs were the owners and holders of certificates totalling 25 per cent of the prospective production. At no time did any of the certificate holders exercise any management or control over the drilling or other affairs of Hub

Ltd. It would appear that Hub Ltd. was organized for the purpose of holding the drilling contract and managing the oil drilling enterprise. There was no provision in the certificate requiring Hub Ltd. to drill, but undoubtedly it was understood that the moneys from the sale of the certificates would be used by Hub Ltd. for that purpose.

The sale of all the certificates, after paying a commission to Allen and his associates, netted Hub Ltd. $67,200, which amount the company expended prior to August 27, 1931, in drilling the well from a depth of 4,000 feet (that being its depth at the time of the execution of the drilling contract or sublease by Newton to Hub Ltd.) to 7,500 feet. The money being exhausted and the well not completed, Sanborn & Co. contacted such of the certificate holders as were their clients, explained to them the fact that the drilling could not continue unless funds were raised, and solicited from them voluntary contributions at the rate of $300 for each 1 per cent of certificates held. Many, but not all, of the certificate holders, including certain of the plaintiffs, contributed upon this basis, the contributions totalling $12,000. There was no written contract stipulating the terms of these contributions but it was understood by the contributors that they were to receive nothing in addition to that which they already owned. The money was to be expended by Sanborn & Co. in the deepening of the well without any restrictions and without any supervision or control by any of the certificate holders.

The drilling continued until October 1, 1931, when these contributions were exhausted. In fact, during the month of September, bills for labor and materials used in the drilling had been incurred to such an extent that there were thousands of dollars owing for which there were no funds to pay.

About this time the defendants began to enter the picture. The defendant Robert E. Hatch was and now is a practicing attorney of this state. Up to September 14, 1931, neither he nor his codefendant knew anything of the affairs of Hub Ltd. and probably did not know there was such a corporation. About that date, Hatch was employed by Clinton L. Walker, who was a certificate holder (he is not a plaintiff herein), to investigate for Walker the affairs of Hub Ltd.

After Hatch started his investigations, the three shares of stock of Hub Ltd. were endorsed by their owners to him in

blank, but as attorney for Walker. Hatch has never claimed
to own them for himself. Hatch thoroughly investigated the
affairs of Hub Ltd. and by October 1, 1931, was completely
cognizant thereof, as well as of the fact that its certificates
had been sold at public offering to the certificate holders with-
out the requisite permit from the California Corporation
Commissioner. He, of course, knew the form of the certifi-
cates and the circumstances under which they had been sold
and the contribution made by some of the certificate holders.

At this time Allen solicited Hatch and the other defend-
ant, Young, an engineer, to advance money and credits for
the continuation of the drilling of the well, explaining, as
the defendants then well knew, that unless funds were pro-
duced from some source the well would be a total loss, and
that Newton would declare a forfeiture of the lease for non-
continuous drilling. Allen stated that if Young and Hatch
would advance money and credit to continue the drilling, he
would undertake to get the certificate holders to make an
arrangement to compensate Young and Hatch on some basis
to be agreed upon, and that in the meantime Young and
Hatch could have the drilling equipment of Hub Ltd., or
a lien thereon, as security. On October 2, 1931, Young and
Hatch agreed to proceed upon this basis outlined by Allen.
However, no consent of the certificate holders was ever ob-
tained. Apparently defendants became the owners of the
Hub Ltd. drilling equipment.

On October 2, 1931, the Board of Directors of Hub Ltd.
held a meeting and elected as directors three persons named
by Allen, Hatch and Young. On October 6, 1931, articles
of incorporation for a new corporation were filed using the
same name as the old but dropping the ''Ltd.'' Allen,
Young and Hatch planned to get the certificate holders to
exchange their certificates for shares in the new corporation,
and Hatch and Young were to receive some of its stock.
Negotiations along these lines were attempted with the certifi-
cate holders, but nothing came of it. October 5th the old
corporation through its newly elected Board of Directors,
purported to convey to the new corporation the drilling
contract or sublease executed by Newton to Hub Ltd. This
conveyance never became effective because the new corpora-
tion never actually acquired a corporate existence, never
functioned as a corporation, and the directors of the old
corporation were never validly elected.

During October and November, 1931, the well was continuously drilled with funds supplied by Hatch and Young to the amount of $29,303.53. December 1, 1931, a production test proved the well to be "wet". For three weeks the drilling was discontinued. December 30, 1931, Newton recorded a notice of forfeiture for default in drilling. December 26, 1931, Newton executed a new drilling contract similar to the Hub Ltd. contract, to Hatch's brother-in-law—admittedly a "dummy". The notice of forfeiture was inoperative because not preceded by a notice of default, apparently required by the contract itself. As the old contract was never terminated, the new one never went into operation, and Hub Ltd., the old corporation, continued to be the holder of the Newton drilling contract. Actual drilling operations after Hatch and Young appeared on the scene were conducted by the defendant Young. Further sums were advanced by Hatch and Young to the amount of $17,880.79, making a total advanced by them in the sum of $47,184.32. February 1, 1932, the well was put on production.

In January, 1935, one Carson became the owner of the entire 56 per cent without notice of plaintiffs' claim and entirely free thereof. Accordingly, plaintiffs would be entitled only to the proceeds of oil up to that date.

Apparently the well was not a great producer. The 56 per cent of the proceeds of the well which the Hub Ltd. was entitled to under the Newton contract, was applied by Young and Hatch in the payment of the expenses in connection with the operation of and production from the well, in the necessary payment of taxes and purchase of equipment. The moneys expended by defendants were necessarily and properly expended in the preservation and completion of the well and had Young and Hatch not advanced the moneys they did, the well would probably have been lost to Hub Ltd. and to the certificate holders.

It was stipulated that 25 per cent (the proportion owned by the plaintiffs) of the proceeds of the well, after making the deductions of expenses specifically prescribed in the certificates, amounted to the sum of $2,426.40. The court did not allow plaintiffs this sum but the sum of $1617.60 only. The court arrived at this figure by using an offer made by some certificate holders to Hatch and Young during the time of certain negotiations which never came to fruition.

However, the plaintiffs are not complaining, and of course, the defendants cannot complain that the court did not award plaintiffs all it could have awarded them. The court made a finding that the acts of defendants were ''in the best of good faith and with the best of intentions to do whatever was right, proper and necessary for all concerned including the Hub Ltd. and its certificate holders''.

The certificate holders divided themselves into three classes after the well came into production. Some did nothing, evidently satisfied to let the proceeds of the well go to discharging the drilling costs, or else had lost interest in the outcome. A second class, known as the ''Holmes group'', sued defendant Hatch in the case of *Holmes* v. *Hatch*, 11 Cal. (2d) 376 [80 Pac. (2d) 70]. There the court held that as Hub Ltd. had not procured a permit from the Corporation Commissioner their certificates were voidable and the holders were entitled to receive from the defendant therein a return of the money they had paid for their certificates. It is interesting to note that in the decision of that case (p. 381) the court states that the defendant Hatch ''frankly states that he has written off the venture as a loss and waives all claim for any and all such advances''. This covers the very amounts claimed in the cross-complaint herein. The third class are those who are the plaintiffs in this action, who sued for an accounting of the proceeds of the oil produced. The defendants contend that this third class should be held legally liable for the entire loss suffered by the defendants in the enterprise.

The basis of this appeal is the claim of the defendants that oil produced should be applied on account of the moneys advanced by the defendants to complete the well and that as the proceeds from the oil produced were not equal to the sums advanced by the defendants, the certificate holders should be required to personally reimburse the defendants for all sums advanced and not covered by proceeds from the sale of oil,—in other words, that the defendants should recover on their cross-complaint against the plaintiffs for all the $47,184.32 advanced above receipts. They claim that they extended credit in expectation of making a special contract; that the contract, through no fault of theirs, was never consummated; that the defendants' moneys were used for plaintiffs' benefit; therefore the defendants were creditors of plaintiffs and as creditors entitled to hold plaintiffs for the entire amounts advanced by defendants for the benefit of

the 56 per cent certificate holders, even though plaintiffs are only 25 per cent certificate holders.

The plaintiffs stand upon the terms of their certificates which state that except for the $8 per month provision they are "not in any way obligated to pay any of the costs of drilling said well, nor . . . responsible for any debts incurred in or about the drilling or operating of said well", and that to give effect to defendants' contention would make the assignment in the certificate an agreement of copartnership, which the certificate expressly states it is not.

Defendants answer this by claiming that the Hub Ltd. was merely a dummy and fictitious entity designed and utilized by the certificate holders for the purpose of defrauding and avoiding responsibility to their creditors, and ask the court to adopt a rule to the effect that royalty certificate holders are in reality joint adventurers and partners in the oil development, and that, regardless of the terms of their certificates, they must be held to have the legal liability of partners towards persons supplying funds, labor or material to the development of the oil.

Defendants make the second point that even if certificate holders in general are not always responsible to the creditors they should be held so here because the corporate fiction was abandoned and the certificate holders themselves were conducting the drilling when defendants extended the credit. This contention, however, is directly contrary to the court's findings, which expressly negatived this entire contention. As the appeal is on the judgment roll alone, the lower court's finding in this behalf makes it unnecessary to discuss this contention further.

The third contention is that plaintiffs at the trial demanded the receipts from the oil which were only possible because of the advances made by defendants, and that by taking the benefit they must bear the burden.

The fourth and fifth contentions have to do with the statute of limitations. Defendants contend that the court erred in allowing the pleading at the end of the trial by the plaintiffs of certain statutes of limitation, in defense of defendants' cross-complaint, and also erred in finding that their cross-complaint was barred by certain statutes of limitation. In view of the determination of the merits of the case, it

becomes unnecessary to consider either one of these contentions.

The principal contention of the defendants is that the court should establish a rule in California that oil royalty certificates are a device to defraud creditors and that the holders should be held liable as partners to creditors. The facts in this case do not require a determination of the legal relationship between an oil royalty certificate holder and a creditor. The relationship of defendants to plaintiffs here is not that of creditor and debtor. Defendant Hatch and his partner Young advanced their money with their eyes open, knowing the express limitation of liability in the certificates, but with the hope and expectation that some arrangement would be worked out by which the defendants would receive, not alone their money back with a reasonable rate of interest, but that they would participate to some considerable extent in the oil itself. A creditor advances money or supplies labor and materials expecting merely the usual profit from the transaction. Here Hatch and Young expected large returns from their actions. While it is true that the certificate holders would have lost their well had not the defendants volunteered to help them, still they should have been given the opportunity of deciding whether or not they desired help and upon what conditions that help was to be given. A large number of them by refusing to contribute any money to the enterprise when the sale of the certificates failed to produce money sufficient to complete the well, indicated that they were through. Defendants' position, instead of that of a creditor, is similar to that of a sublessee or assignee, such as they would have been had they taken an assignment of the Hub Ltd. contract with Newton. Practically speaking, they stepped into the shoes of Hub Ltd., and with full knowledge of the entire situation, accepted its responsibilities. True, Hub Ltd. had no interest in the production of the well. It only had the obligation to Newton to drill the well; yet the defendants knew that, and gambled upon their ability to work out some sort of an arrangement with the certificate holders which would redound to defendants' advantage. The defendants assumed to carry on the Hub Ltd. contract, of their own volition and without any request or consent of the certificate holders, confident of their ability to persuade the certificate holders to give them an interest in the production of the well or by the

transactions between the new and the old corporation or the Newton forfeiture and a new drilling contract from Newton to the dummy of the defendants, to compel the certificate holders to make a favorable division or arrangement with defendants.

At the oral argument on this appeal, counsel for defendants made the statement that possibly the position of the defendants was that of interlopers, and that they thought that as interlopers they should be reimbursed for the moneys they had advanced for the benefit of the certificate holders. But an interloper has no rights. He takes his chances that those he has benefited by his intrusion may recognize some moral obligation to him. But surely he has no greater rights than would a sublessee or assignee of Hub Ltd. The corporation had made a definite contract with its certificate holders that they would not be liable for the cost of drilling, yet the defendants, after a complete examination and understanding of the whole situation, advanced their money based upon an understanding with Allen, who did not represent the certificate holders in any way, that Allen would undertake to get the certificate holders to make an arrangement to compensate the defendants "on some basis to be agreed upon".

*In re Lathrap,* 61 Fed. (2d) 37, can readily be distinguished from the case at bar. There the court held that in bankruptcy, the proceeds of the oil should be distributed to the general creditors in preference to persons holding royalty certificates similar to those issued by Hub Ltd. It did not consider the question of whether or not the certificate holders would be personally liable to creditors, although there are cases in other states which seem to so hold. But the chief distinguishing feature of *In re Lathrap* and these other cases is that there were creditors who had dealt with the company in good faith and "only for a normal profit" (61 Fed. (2d) p. 44). Thus the rule there applied seems to be limited to credit "for a normal profit". Again in the Lathrap case, page 44, the court uses this extremely significant language: "These per cent holders are junior in right to the general creditors who furnished commodities to the bankrupt *not at speculative but at normal profit."* (Italics added.) Here, the actions of the defendants were not for a normal profit but for a highly speculative one, a percentage

interest in the production of the well when completed. In the letter of the defendant Hatch to the stockholders, included by reference in the findings, he stated there was to be a division of the interests of the certificate holders with Hatch and Young as compensation for their services in continuing the well and assisting in financing it. In this same letter the defendant Hatch notified the certificate holders that due to the forfeiture declared by Newton (which the lower court held to be void), and the making of a new drilling contract between Newton and an undisclosed party (who actually was a dummy for the defendants), all interests of the certificate holders, as well as of Hub Ltd. in the well and its production had terminated and ended. This letter shows that at that time the defendant Hatch, at least, if not the defendant Young, his partner, did not regard themselves in the light of creditors of the certificate holders, or feel in any way that the relationship between them and the certificate holders was one wherein they could claim reimbursement from the certificate holders. This is significant, in view of the fact that Mr. Hatch was an attorney and completely conversant with every phase of the matter. His own interpretation at that time of the relationship between the certificate holders and him and his partner, and the position he took in *Holmes* v. *Hatch, supra,* as to the moneys expended, are at variance with the contentions urged at this time.

Defendants' third contention is that, irrespective of the relationship created by the royalty certificates, the certificate holders are bound in *assumpsit* to the defendants for the moneys advanced by them which enabled the well to be completed and which provided the oil, the proceeds from which plaintiffs are now claiming. To support their position defendants cite the Golden Rule, sections 3521, 1589 and 2310 of the Civil Code, to the effect that he who takes the benefit must bear the burden, and several cases such as *MacDonald* v. *Reich & Lievre, Inc.,* 100 Cal. App. 736 [281 Pac. 106], and *Pollak* v. *Staunton,* 210 Cal. 656 [293 Pac. 26], which hold that one who purchases stock, the sale of which is unauthorized by the Corporation Commissioner, may sue in *assumpsit* to get his money back. However, these principles do not apply here because of the fact that the very advances made by defendants were those which it had been stipulated in the certificates the holders were not to pay, and their interests in the proceeds of the oil not to be liable for. Defendants

contend that had they not volunteered as they did, the Newton lease would have been forfeited, and that, moreover, there was so little time left in which to act when the drilling stopped that the defendants had to proceed without making any arrangement with the certificate holders. While this is true, it appears that Hatch and Young were much more concerned at the time about this question of forfeiture than were the certificate holders themselves. The certificate holders did not seem disturbed about the lease being forfeited, but the defendants apparently were. Hence, they injected themselves into the situation as volunteers, expecting to reap a harvest, but being volunteers they are bound by the rule that a volunteer cannot recover the moneys advanced by him. (48 C. J., p. 734, sec. 280, et seq.; 5 Pomeroy's Equity Jurisprudence, 4th ed., sec. 2335, p. 5163; Equitable Remedies, 2d ed., sec. 912, p. 5166.) Moreover, the entire circumstances under which defendants intruded into the situation and the entire history of the matter negatives any right to reimbursement from the certificate holders or from the oil produced. To deny plaintiffs their recovery herein would be to totally disregard the express conditions set forth in their certificates, of which conditions defendants had full knowledge before and during the making of their expenditures. As a matter of fact, when the invalid transfer of the Newton contract was made by Hub Ltd. to the new corporation it was apparently intended to wipe out any relationship between the certificate holders on the one hand and Hatch and Young and the proceeds of the oil, on the other, except such as would have resulted had the certificate holders exchanged their certificates for stock in the new company. Had the transfer not been invalid, there would have been no attempt by Hatch and Young to hold the certificate holders for the moneys advanced by them. This is another instance of the fact that the defendants, during the whole proceeding, never claimed that there existed between them and the certificate holders the relationship which they now attempt to assert.

The only reasonable result is, that the defendants, by reason of the peculiar circumstances of the case and their actions, have placed themselves in a position where their rights can be no greater than would be those of one to whom Hub Ltd. had made a valid assignment or sublease of its rights

under the Newton drilling contract. Such an assignee or sublessee would take fully subject to the certificate holders' rights to receive their shares of the oil, undiminished by any costs of drilling or operating, as specifically provided in their certificates.

Judgment affirmed.

Knight, Acting P. J., and Ward, J., concurred.