[S. F. No. 13226. In Bank.—October 31, 1930.]

A. J. POLLAK, Respondent, v. W. E. STAUNTON et al., Defendants; JOHN SALSBERRY, Appellant.

John H. Crabbe for Appellant.

Arnold ·C. Lackenbach for Respondent.

Norman T. Mason, *Amicus Curiae.*

SEAWELL, J.—Plaintiff brought action to recover from defendants upon a common count for money had and received the sum of $21,532.49. Upon receipt of $5,000 from defendants Berger and Staunton, the action was dismissed as to them and as to the defendant Western Lead Mines Company. From a judgment entered against defendant Salsberry for the balance, to wit, $16,532.49, said defendant appeals. The sum of $21,532.49 was the price for which 20,000 shares of stock of the Western Lead Mines Company, a Nevada corporation, owned by plaintiff, were sold by defendant Staunton. The proceeds of the sale were divided equally between the three defendants.

Said three defendants were the organizers and directors of said Western Lead Mines Company. In August, 1925, plaintiff purchased said 20,000 shares from defendant Salsberry. Plaintiff also held an option given by the corporation and expiring May 1, 1926, to purchase 100,000 shares at $.25 a share. In December, 1925, defendants falsely represented to plaintiff that they had paid $25,000 from their personal funds into the treasury of the corporation on behalf of plaintiff and in the exercise of said option. A certificate for 100,000 shares was actually issued in plaintiff's name in December, 1925. By said false representation defendants obtained possession of said 20,000 shares and plaintiff's consent to the sale thereof and the division of the proceeds among themselves to ·repay them for the amount they claimed to have advanced on plaintiff's be-

half, as will more fully hereafter appear. The 100,000 shares were illegally issued to plaintiff, inasmuch as no permit had been obtained from the corporation commissioner authorizing the sale of said stock in this state. The proceeds from the sale of the 20,000 shares, retained by defendants, represent the price paid by plaintiff for the 100,000 shares which were illegally issued. It is conceded that the 20,000 shares owned by plaintiff were legally issued. Said shares were the personally owned stock of defendant Salsberry, legally issued to him in the state of Nevada and by him transferred to plaintiff. █ A natural person owning securities of which he is not the issuer or underwriter may sell such securities for his own account without procuring a permit from the commissioner of corporations. (*People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089].)

The findings follow the allegations of the complaint for money had and received and merely recite the receipt by defendants of $21,532.49 for the use and benefit of plaintiff, no part of which had been paid except the sum of $5,000. We are of the view that the judgment against Salsberry for $16,532.49 may not be sustained, but that recovery against him for $7,177.49, the amount of the proceeds of the sale actually received by him, may be allowed.

The Western Lead Mines Company was organized in the state of Nevada in August, 1925, for the purpose of operating a lead mine in Inyo County, this state. The minutes of the corporation recite that the entire capital stock, consisting of 1,500,000 shares, was issued to defendant Salsberry in consideration of his transfer to the company of the mining property which the corporation was to operate, and, further, that Salsberry donated back to the corporation 600,000 shares. Plaintiff, who testified that his business was that of oil producer, agreed to purchase 20,000 shares at $.25 a share in August, 1925, and also took an option given in the name of the corporation and expiring May 1, 1926, to purchase an additional 100,000 shares at said price. He completed payment for said 20,000 shares in November and received a certificate issued in the name of defendant Salsberry and by him indorsed to plaintiff. It is the proceeds from the sale of this stock, subsequently delivered by plaintiff to defendant Staunton, which plaintiff seeks to recover herein upon the count of money had and received.

In December, 1925, defendants represented to plaintiff that they were negotiating with C. C. Julian to interest him in the corporation, and that they had falsely told Julian that plaintiff had already exercised the option to purchase 100,000 shares. They urged plaintiff to exercise his option in order to make good their misrepresentations to Julian, and said that unless he did it would be necessary for them to raise the money themselves. In a subsequent conversation they represented to plaintiff that they had paid $25,000 into the corporation. On December 28, 1925, Staunton executed and delivered to plaintiff two instruments in the form of letters, to which plaintiff gave his indorsement. One of said letters acknowledged the receipt of Pollak's certificate for 20,000 shares, which Staunton was "to handle and dispose of as he deems for the best interest of plaintiff". The proceeds in case of any sale were to be paid over to plaintiff, and if the stock was not sold by May 1, 1926, the certificate was to be returned.

The other letter referred to the 100,000 shares. It contains the following statement: "You are advised that with your consent, and without any responsibility attaching to you therefor, the undersigned has exercised the privilege granted in said option, and has paid into the treasury of said company the sum of Twenty-five Thousand Dollars ($25,000.00) in lawful money of the United States, and has had issued to you Certificate No. 183 for one hundred thousand (100,000) shares of the capital stock in said Western Lead Mines Company." The letter then requests the indorsement and delivery of the certificate to Staunton, to be handled and disposed of as he deems best, Staunton to deduct and repay to himself from the proceeds of any sale the sum of $25,000 before paying the balance to plaintiff. The letter further provided that if the stock had not been sold by May 1, 1926, plaintiff might at his option ("but no legal obligation shall be presumed to exist therefor") purchase the stock at $.25 a share. A certificate for 100,000 shares, issued in the name of plaintiff, was exhibited to him on December 28th, when the letters were signed and delivered to plaintiff, and at that time indorsed by him as provided by the terms of the letter. Staunton took the certificate and plaintiff at no time thereafter had possession of it. On January 11, 1926, Staunton sold the 20,000

shares, which plaintiff had bought at a price of $5,000, to C. C. Julian for $21,532.49, or $1.07 a share. The proceeds of this sale were divided equally between the three defendants. Julian's check for $10,000 in favor of plaintiff was exhibited to him by Staunton, who requested plaintiff to indorse it to defendant to reimburse them for the payment claimed to have been made on plaintiff's account. Julian paid the balance directly to defendants. The membership of the board of directors was increased from three to five. Julian became a director in November, 1925. Some time after the sale of the 20,000 shares the stock of the company became worthless.

The representation made to plaintiff that defendants had paid $25,000 in cash into the corporate treasury to cover up misrepresentations made to Julian was false, and defendants had made no cash payment whatever for such purpose. The books of the corporation showed credits due defendants amounting to $54,800, which appeared from testimony upon the trial to consist largely of commissions on the sale of stock to Julian and one other person. Said commissions seem excessively large. At or about the time the certificate for 100,000 shares was issued in the name of plaintiff in December, 1925, defendants reduced their credits on the books of the corporation by $25,000 and credited the corporation with having received $25,000 from plaintiff. Plaintiff did not discover that defendants had not paid $25,000 in cash into the corporation until a few days before he instituted the action herein, on April 5, 1927.

It appears from the evidence that one of the objects of defendant Staunton in obtaining possession of the 20,000 shares, as well as the 100,000 shares, with the right ''to handle and dispose of the same'', was to insure a unified control of all stock to facilitate the operations of Julian, which an outstanding option existing in plaintiff's favor would have prevented.

No permit authorizing the sale of the stock of the company in this state had been obtained. The sum of $21,532.-49, for which the 20,000 shares were sold by defendant Staunton, was to pay part of the purchase price of said 100,000 shares. Defendant's contention that the transaction with plaintiff as to the 100,000 shares did not violate the Corporate Securities Act (Stats. 1917, p. 673) cannot

be upheld. Section 3 of the act provides that ''No company shall sell . . . or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do.'' Subsequent provisions of the section make it expressly applicable to corporations organized under the laws of other states. Plaintiff was ignorant of the fact that no permit had been obtained until after the sale of his 20,000 shares. Although the option given in the name of the corporation was actually executed by the corporate officers in Nevada, all offers to sell to plaintiff were made by defendants in oral negotiations with plaintiff in this state, and all acts of plaintiff from which a consent to the issuance of stock may be implied took place in this state. Upon the execution of the letters or agreements of December, 1925, had in San Francisco, the certificate for 100,000 shares of the treasury stock of the corporation was delivered to plaintiff and thereupon indorsed by him and turned over to defendants in accordance with the terms of said agreement. Plaintiff at no time authorized defendant Staunton, as his agent, to accept delivery of the 100,000 shares for him in Reno, Nevada, on December 28, 1925, or at any other time.

Where stock has been issued without a permit it is void by the terms of the act (sec. 12), and the purchaser who is ignorant of such unauthorized issue may recover payments made by him on account of the purchase price. (*Reilly* v. *Clyne*, 27 Ariz. 432 [40 A. L. R. 1005, with note, 234 Pac. 35]; *Reno* v. *American Ice Machine Co.*, 72 Cal. App. 409 [237 Pac. 784]; *Otten* v. *Riesener Chocolate Co.*, 82 Cal. App. 83 [254 Pac. 942]; *Barrett* v. *Gore*, 88 Cal. App. 372 [263 Pac. 564].) An action for money had and received is an appropriate proceeding in which to obtain relief. (*Barrett* v. *Gore, supra; Hemmeon* v. *Amalgamated Copper Mines Co.*, 95 Cal. App. 400 [273 Pac. 74]; *MacDonald* v. *Reich & Lievre*, 100 Cal. App. 736 [281 Pac. 106]; *Smith* v. *Bach*, 183 Cal. 259.) The purchaser, for whose benefit the Corporate Securities Act has been enacted, is not *in pari delicto* with the corporation or its agents. ''Where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men—the one, from their situation and

condition being liable to be oppressed or imposed upon by the other—there the parties are not *in pari delicto;* and, in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract." (*Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285, 291] ; see, also, *Reilly* v. *Clyne, supra; Smith* v. *Bach, supra; Hemmeon* v. *Amalgamated Copper Mines Co., supra; Castle* v. *Acme Ice Cream Co.,* 101 Cal. App. 94 [281 Pac. 396].)

Appellant also contends that plaintiff has lost his right to recover any part of the sum for which the 20,000 shares were sold by his conduct subsequent to the issuance of the 100,000 shares to him on December 28, 1925. He first learned, as a result of the investigation of the operations of C. C. Julian by the corporation commissioner, that no permit for the transfer of the stock had been granted late in January or in February, 1926. Immediately upon delivery of the stock to him, plaintiff indorsed it and returned it to defendant Staunton under the agreement of December 28, 1925, and at no time thereafter did he have possession of it. But plaintiff made repeated demands for delivery of the certificate, and on April 26, 1926, his attorney wrote demanding its delivery. Salsberry testified that on one occasion plaintiff threatened to sue if the stock was not turned over to him. It would appear that the void stock was retained because Julian desired to maintain a unified control of the corporation. Appellant also relies on a statement of plaintiff made to Julian and other directors in May, 1926, when Julian was having difficulties with the corporation commissioner, to the effect that plaintiff "would stand by the crowd that was running the boat". Appellant also claims that a few days prior to the commencement of the action herein, plaintiff had discussed with Julian the advisability of turning over his 100,000 shares in exchange for shares of another corporation Julian was organizing.

Plaintiff testified upon the trial, and his conduct indicates, that he regarded himself as the owner of the 100,000 shares even after he knew that the corporation had obtained no permit. Plaintiff could not by his conduct ratify or impart validity to the void contract and void stock. As said by the court in *Reno* v. *American Ice Machine Co.,* 72 Cal. App. 409 [237 Pac. 784] : "Such a contract had no legal

existence for any purpose and neither action nor inaction of a party to it can validate it and no conduct of a party to it can be invoked as estoppel against asserting its invalidity." (See, also, *Tatterson* v. *Kehrlein, supra; Reilly* v. *Clyne, supra; Boss* v. *Silent Drama Syndicate,* 82 Cal. App. 109 [255 Pac. 225].) ▪ As between the corporation or its agents receiving payment for stock which is illegally issued and void, and the purchaser who in his dealings with the corporation persists in the notion that the stock possesses some validity, the corporation should not be privileged to take advantage of his error to retain money for which, by reason of its own violation of law, it gives nothing in return.

▪ In addition to the stock being void, plaintiff was induced to become a party to the transaction by false representations of defendants, upon which he relied, to the effect that they had paid $25,000 in cash into the corporation on his account, when, in fact, they had merely reduced the amount they claimed to be due them for commissions. Instead of there being $25,000 in cash available for development of the mine in the corporate treasury, the corporation received no cash as a result of the transaction. The very fact that defendants represented that they had paid $25,000 in cash into the corporation reveals a purpose to conceal from plaintiff their intention to use any cash received to pay commissions. It cannot be held that such a deception is immaterial. One of the factors most thoroughly investigated by the corporation commissioner before a permit is granted is the use to which the proceeds from the sale of stock are to be devoted.

▪ No obligation rested on plaintiff to investigate the books of the corporation to determine the truth of defendants' representation that a cash payment had been made to the corporation. ▪ Although the certificate was issued in the name of plaintiff, he never had possession except to indorse it and return it to defendants under the agreement of December 28, 1925. He received nothing of value arising from the issuance of stock in his name which he can or should restore to defendant Salsberry as a condition to recovery. Defendants are not relieved of liability because during the time the stock stood in the name of plaintiff its listing price, for a very brief period, rose far above the price of twenty-five cents a share which plaintiff was to pay.

Defendant Salsberry makes the claim that it was Staunton and Berger who conducted the negotiations with plaintiff. Plaintiff claims that Salsberry was present and actively participated in the transaction. However this may be, it appears from the testimony of Salsberry himself that at least he was kept informed throughout the transactions with plaintiff, and knew that no permit had been obtained from the corporation commissioner for the issuance of the 100,000 shares of stock and that his codirectors had misrepresented to plaintiff the payment of $25,000 into the treasury to cover up misrepresentations made to Julian. Although the letters or agreements of December 28, 1925, were signed by Staunton, defendant knew the arrangements under which Staunton received possession of and sold the 20,000 shares. His receipt of one-third of the proceeds of the sale under such circumstances renders him liable in an action for money had and received.

Appellant Salsberry contends that in any event in an action for money had and received his liability is limited to the amount received by him to wit, one-third of $21,532.49 or $7,177.49. This contention must be upheld. The action for money had and received is based upon an implied promise which the law creates to restore money which the defendant in equity and good conscience should not retain. The law implies the promise from the receipt of the money to prevent unjust enrichment. The measure of the liability is the amount received. (*Minor* v. *Baldridge,* 123 Cal. 187 [55 Pac. 783]; *Whittier* v. *Home Sav. Bank,* 161 Cal. 311 [119 Pac. 92]; *French* v. *Robbins,* 172 Cal. 670 [158 Pac. 188]; *Smith* v. *Bach,* 53 Cal. App. 63 [199 Pac. 1106]; Id., 54 Cal. App. 236 [201 Pac. 611]; 2 R. C. L. 761; Woodward on The Law of Quasi-Contracts, p. 439; Keener on Quasi-Contracts, p. 200.)

The release by plaintiff of all claims against Staunton and Berger arising from the transaction, upon payment by them of $5,000 shortly before the trial, did not terminate plaintiff's right to recover from Salsberry in an action for money had and received the amount actually received by Salsberry. We do not regard the rule of such cases as *Flynn* v. *Manson,* 19 Cal. App. 400, cited by appellant, as controlling. In the case herein the action was brought by plaintiff to recover the price paid by him for shares of corporate stock which, by reason of defendants'

violation of law in failing to procure a permit from the corporation commissioner, were void. An action for money had and received sounds in *assumpsit*. Each defendant is severally liable in such an action for the portion of the amount paid by plaintiff which he received. The release of one or more defendants upon their several liabilities does not operate to discharge another defendant upon his several liability.

We have made close examination of the case presented and upon mature consideration we are constrained to say that while the evidence is sufficient to sustain the modified judgment directed to be entered herein, the case because of a failure to observe the law requiring the issuance, sale and purchase of stock, is brought quite close to the border line which courts will not cross in an effort to give assistance to those who have heedlessly followed the phantom of speculation into questionable realms.

It is ordered that the judgment be reduced from $16,532.-49, to $7,177.49, with interest from January 11, 1926. As thus modified the judgment is affirmed.

Richards, J., Shenk, J., Curtis, J., Preston, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.