GUNLOCK CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DEXOL INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gunlock Corp. v. Commissioner
Docket Nos. 1854-79, 2058-79.
United States Tax Court
T.C. Memo 1982-105; 1982 Tax Ct. Memo LEXIS 641; 43 T.C.M. (CCH) 687; T.C.M. (RIA) 82105; March 2, 1982. Milan D. Smith, Jr., for the petitioner. Charles O. Cobb, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in and additions to the petitioners' Federal income tax: Taxable Year
Gunlock
Dexol
Ending
Corporation
Industries
31 December 1973
$ 10,654.00
31 December 1974
27,616.00
$ 3,250.00
31 December 1975
29,562.00
6,750.00
The issues presented for decision are: (1) whether, during the years 1973, 1974, and 1975, petitioner Gunlock Corporation and Wilshire Gardens, Inc. (hereinafter Wilshire Gardens) were members of an affiliated group within the meaning of section 1504 of the Internal Revenue Code of 1954. [1] The resolution of this issue *643 depends uponwhether Theodore Gunlock in early 1973 effectively transferred his stock in Wilshire Gardens to petitioner Gunlock Corporation; and (2) whether petitioners Gunlock Corporation and Dexol Industries, Inc. (hereinafter Dexol) were brother-sister corporations within the meaning of section 1563(a)(2) during 1974 and 1975 and were therefore collectively entitled to only one surtax exemption. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Gunlock Corporation and Dexol were, during the years in issue, California corporations doing business in California. Gunlock Corporation and Wilshire Gardens filed consolidated Federal income tax returns for the taxable years 1973 through 1975 with the Internal Revenue Service Center at Fresno, California. These returns reflect the following losses of Wilshire Gardens: Loss Included in
Year
Consolidated Return
1973
$ 22,197.00
1974
50,764.00
1975
63,533.00
*644 Petitioner Dexol filed its 1974 and 1975 Federal income tax returns with the Internal Revenue Service Center at Fresno, California. During the years in issue, Theodore Gunlock was the president of both Gunlock Corporation and of Wilshire Gardens and owned 100 percent of the stock of Gunlock Corporation. In 1972, he became the sole owner of the 1,002 outstanding shares of Wilshire Gardens. For several years prior to 1972, Wilshire Gardens had been incurring losses and, by 1972, could no longer use a net operating loss carryback. Prospects for short-term recovery appeared bleak to Stanley Henslee, Certified Public Accountant, who was employed by Theodore Gunlock and the corporations which he controlled. As a result, in conversations during the spring and summer of 1972, Mr. Henslee recommended to Theodore Gunlock that he transfer his stock in Wilshire Gardens to Gunlock Corporation so that the corporations could file consolidated income tax returns and Wilshire Gardens' losses would offset Gunlock Corporation's income. In November 1972, immediately prior to going on vacation, Theodore Gunlock advised Mr. Henslee that he had decided to transfer his Wilshire Gardens' stock *645 to Gunlock Corporation and that the transfer would be effected after he returned from his vacation sometime in January of 1973. On the morning of January 12, 1973, Theodore Gunlock, Mr. Henslee, and Joyce Hamm, an employee of Dexol Corporation, met at the offices of Dexol for the purpose of transferring all of the 1,002 outstanding shares of Wilshire Gardens' stock from Theodore Gunlock to Gunlock Corporation. At the meeting, Mr. Henslee reminded Mr. Gunlock of the importance of going forward with the transfer. Mr. Gunlock brought with him to the meeting the stock certificate book of Wilshire Gardens. Certificates number 4, 5, and 6 evidenced Mr. Gunlock's ownership of the outstanding stock of this corporation. Mr. Gunlock handed the stock certificate book to Mr. Henslee. Mr. Henslee removed certificates 4, 5, and 6 and handed them to Mr. Gunlock.In the presence of Mr. Henslee and of Joyce Hamm, Mr. Gunlock endorsed these certificates over to Gunlock Corporation and handed them back to Mr. Henslee, who replaced them in the stock certificate book. Mr. Henslee then prepared certificate number 7, which evidenced Gunlock Corporation's ownership of the 1,002 Wilshire Gardens' *646 shares and recorded their transfer from Mr. Gunlock, and gave it to Mr. Gunlock. Mr. Gunlock signed the certificate as president of Wilshire Gardens. He then handed the certificate back to Mr. Henslee who placed it in the stock certificate book. Mr. Henslee handed the stock certificate book to Mr. Gunlock, acting in his capacity as the president of Gunlock Corporation, in order to effect delivery of the Wilshire Gardens' stock to Gunlock Corporation. There was no question in either Mr. Henslee's or Mr. Gunlock's mind that the stock had been effectively transferred. Gunlock Corporation agreed to pay Mr. Gunlock $ 8,834 for the Wilshire Gardens' stock, which was the amount he had paid for it. Payments were to be made only out of the earnings of Wilshire Gardens, however, and no payments were to be made until the deficit in Wilshire Gardens' retained earnings had been eliminated by profit. When the deficit was cured, Gunlock Corporation was to execute a note payable to Mr. Gunlock for the purchase price. The deficit was never cured, however, so that no such note payable was ever executed or delivered. In 1976, Wilshire Gardens' assets were transferred to a trustee and sold for *647 the benefit of its creditors. A meeting of the Board of Directors of Gunlock Corporation was held on January 15, 1973, at which the Board voted to approve Gunlock Corporation's purchase of the Wilshire Gardens' stock on these terms. At the time of the January 12, 1973, meeting, the stock of Wilshire Gardens was subject to the following legend condition: It is unlawful to consummate a sale or transfer of this security, or any interest therein, or to receive any consideration therefor, without the prior written consent of the Commissioner of Corporations of the State of California, naming both transferor and transferee, except that transfers may be effected without such consent to the transferor's parents, children, grandchildren, spouse, and custodians or trustees for their account, or to holders of securities of the same class of the issuer of this security, on condition that any certificate evidencing this security issued to such transferee, shall contain this legend condition. Mr. Henslee was aware of the legend condition but had been advised by an attorney that it did not apply to transfers between related parties. He assumed that Mr. Gunlock and Gunlock Corporation were *648 related parties because Mr. Gunlock owned 100 percent of the latter's stock. It was accordingly his good faith belief that the consent of the Corporations Commissioner need not have been obtained prior to any transfer of Wilshire Gardens' stock to Gunlock Corporation. Mr. Gunlock was also aware of the condition but had been previously informed by an attorney that the provision was designed to protect unrelated third parties by insuring that they had full knowledge of all relevant facts. He felt, however, that in the case of a transfer between him and his wholly owned corporation, the provision would not apply because there were no unrelated parties and hence no reason to apply it. Accordingly, he too believed in good faith that the consent of the Corporations Commissioner to the transfer was not required. Mr. Henslee made no entry in the books of Gunlock Corporation with respect to its purchase of Wilshire Gardens' stock. The reason he did not make such an entry was that the Gunlock Corporation's obligation to make any payments for the stock was too contingent to be recorded under generally accepted accounting principles. Mr. Gunlock did not report the sale of his Wilshire *649 Gardens' stock on his 1973 Federal income tax return. His reason for not reporting the sale was that he sold the stock for what he paid for it and hence there was no gain or loss to report. In the minutes of the annual meetings of the shareholders of Wilshire Gardens, Inc., for 1973, 1974, and 1975, Mr. Gunlock was identified as the 100-percent owner of the issued stock of Wilshire Gardens, Inc. These minutes were signed by Mr. Gunlock. He did not review them carefully or even cursorily prior to signing them. Mr. Gunlock tended to dismiss paperwork, recordkeeping requirements, corporate formalities and administrative details as burdensome trivialities which merited little of his time and attention. He was thus very sloppy in attending to these matters and relied very heavily on his attorney and CPAs to properly execute them. These minutes were prepared by Mr. Gunlock's attorney, Dale Lee.At the time that he prepared them, Mr. Lee was not aware that Mr. Gunlock had attempted to transfer his shares of Wilshire Gardens to Gunlock Corporation because Mr. Gunlock had not so informed him. On June 30, 1976, Wilshire Gardens entered into a general assignment of all of its assets *650 for the benefit of its creditors. Mr. Gunlock signed the General Assignment as president of Wilshire Gardens. Attached to the General Assignment was the following: CONSENT TO ASSIGNMENT BY STOCKHOLDERS We, the undersigned, being owners and holders of 100% shares of stock being more than 51% of the subscribed and issued stock of WILSHIRE GARDENS, INC., a corporation, do hereby give our consent to the within assignment and transfer of the property of said corporation. NAME
SHARES HELD
/s/
100%
Theodore Gunlock
The General Assignment was prepared at the direction of Dale Lee, who gave it to Mr. Gunlock to sign. At the time, Mr. Lee was not aware of Mr. Gunlock's transfer of his Wilshire Gardens' stock. Mr. Gunlock did not read it prior to signing it because he thought that Mr. Lee had reviewed it for accuracy. On July 30, 1976, all of the assets of Wilshire Gardens were sold to the highest bidder, Jane Olah, for the sum of $ 10,450. No entry with respect to the sale of the assets of Wilshire Gardens was made on the 1976 Federal consolidated income tax return of Gunlock Corporation and Wilshire Gardens. Schedule L of that return listed the following *651 assets of Wilshire Gardens as of December 31, 1976: Cash
$ 12,048.00
Buildings and Other
Depreciable Assets
$ 1,012.00 Less: Accumulated
Depreciation
($ 1,012.00)
Total Assets
12,048.00
Wilshire Gardens filed consolidated returns with Gunlock Corporation for the taxable year 1973 and all subsequent taxable years until it went out of existence. As noted previously, Dexol filed Federal income tax returns for taxable years 1974 and 1975 with the office of the Internal Revenue Service at Fresno, California. In computing tax due, Dexol claimed a full $ 25,000 surtax exemption on its 1974 return. On its 1975 return, it claimed a full $ 50,000 surtax exemption and applied a 20 percent tax rate to the first $ 25,000 of its taxable income. On its 1974 return, Gunlock Corporation claimed a full $ 25,000 surtax exemption. On its 1975 return, it claimed a full $ 50,000 surtax exemption and applied a 20 percent rate to the first $ 25,000 of its taxable income. During 1974 and 1975, Theodore Gunlock owned all of the outstanding shares of Gunlock Corporation. On December 31, 1974 and 1975, respectively, Theodore Gunlock and his unadopted *652 stepson and stepdaughter, Harold Harkness and Jane Olah, owned the following shares of Dexol stock: 31 December 1974
31 December 1975
As a Percentage
As a Percentage
Number of
of Total Shares
Number of
of Total Shares
Shares Owned
Outstanding
Shares Owned
Outstanding
Theodore Gunlock
106.929
67.34 100.929
63.34 Jane Olah
16.878
10.63 19.878
12.52 Harold Harkness
16.878
10.63 19.878
12.52 Totals
140.685
88.60%
140.685
88.38%
In his statutory notices of deficiency, the Commissioner determined (1) that Gunlock Corporation was not entitled to file a consolidated return with Wilshire Gardens because the transfer of January 12, 1973, was not effective to pass title in the Wilshire Gardens' stock from Mr. Gunlock to Gunlock Corporation and hence Gunlock Corporation never owned at least 80 percent of Wilshire Gardens' outstanding stock, as required by section 1504(a)(2); and (2) that Gunlock Corporation and Dexol were brother-sister corporations within the meaning of section 1563(a)(2) and were hence entitled to only one surtax exemption under section 1561(a)(1). OPINION Issue *653 1. Consolidated Return
As of January 12, 1973, Theodore Gunlock was the sole stockholder of both Wilshire Gardens and Gunlock Corporation. For a number of years prior to that date, Wilshire Gardens had been incurring substantial losses and, as of 1973, was no longer able to make use of any net operating loss carrybacks. Mr. Gunlock's CPA, Mr. Henslee, advised him to transfer his Wilshire Gardens' stock to Gunlock Corporation, thus enabling the corporations to file consolidated returns so that Wilshire Gardens' losses would offset Gunlock Corporation's net income. In late 1972 Mr. Gunlock decided to go ahead with the transfer. On January 12, 1973, he, Mr. Henslee, and Joyce Hamm met for this express and exclusive purpose. Mr. Gunlock endorsed and delivered his Wilshire Gardens' stock certificates over to Gunlock Corporation. The Wilshire Gardens' stock was subject to a legend condition which required that the consent of the California Commissioner of Corporations be obtained prior to any transfer of such stock. Such consent was never obtained. Gunlock Corporation was to pay Mr. Gunlock a sum equal to the amount he had paid for the stock. However, payments were to be made *654 only from the earnings of Wilshire Gardens and only after the deficit in its retained earnings had been cured. Once the deficit was cured, Gunlock Corporation was to issue a promissory note to Mr. Gunlock for the purchase price. The deficit was never cured, no note was issued, and no payments were made. Subsequently, Gunlock Corporation and Wilshire Gardens filed consolidated returns for taxable year 1973 and for each subsequent taxable year that Wilshire Gardens continued to exist. No entry was made on the books of Gunlock Corporation reflecting the transfer of stock because Gunlock Corporation's obligation to pay for the stock was too contingent under generally accepted accounting principles. Mr. Gunlock did not report the transfer of his Wilshire Gardens' stock on his 1973 Federal income tax return because he believed that, as he sold the stock for what he paid for it, there was no gain or loss to report. Subsequently, he signed various documents in which he was identified as the sole shareholder of Wilshire Gardens. He did not review these prior to signing them, and they were prepared by persons who were unaware of the transfer of January 12, 1973. *655 Section 1501 grants an "affiliated group" of corporations the privilege of making a consolidated income tax return. Section 1504(a) defines an affiliated group as one or more chains of includible corporations connected through stock ownership with a common parent which is an includible corporation if 80 percent of the stock of each of the includible corporations is owned by one or more of the other includible corporations and the common parent owns at least 80 percent of at least one of the includible corporations. In the context of the present case, this means that Gunlock Corporation, in order to claim the benefits of filing a consolidated return with Wilshire Gardens, must show that it was, during the periods in issue, owner of more than 80 percent of the stock of Wilshire Gardens. Petitioner contends that on January 12, 1973, Mr. Gunlock effectively transferred all of his stock in Wilshire Gardens to Gunlock Corporation, so that Gunlock Corporation became the 100-percent owner of the stock of Wilshire Gardens. Respondent counters that no valid transfer occurred because (1) the transfer was in violation of the legend condition to which the stock was subject, (2) there was *656 no "delivery" of the stock to Gunlock Corporation, and (3) the subsequent actions of the parties indicate that the transfer lacked substance. We note at the outset that Mr. Gunlock and the other parties to the January 12, 1973, meeting, fully intended to effectuate a transfer of his Wilshire Gardens' stock to Gunlock Corporation and held the meeting for this express purpose. At the meeting, Mr. Gunlock endorsed his Wilshire Gardens' stock certificates over to Gunlock Corporation and then retained the certificates as president of Gunlock Corporation. We are not aware of, nor has respondent suggested, anything further the parties could have done to effectuate delivery of the stock to Gunlock Corporation than placing the certificates in the personal possession of its president. We are thus persuaded that the Wilshire Gardens' certificates were endorsed and delivered to Gunlock Corporation with the full intent on the part of all present that the ownership of the Wilshire Gardens' stock be thereby transferred. A contract for the sale of shares in California is ordinarily executed by endorsement and delivery. Cal. Comm. Code sec. 8309; *657 Klein v. Farmer,70 Cal. App. 2d 51, 160 P.2d 30 (1945). Respondent claims, however, that the legend condition required that Mr. Gunlock obtain the consent of the Corporations Commissioner prior to transferring the stock and that the failure to do so rendered the transfer void and of no legal effect. Petitioner responds that the violation merely rendered the transfer voidable at the instance of Gunlock Corporation rather than void abinitio.
Under Cal. Corp. Code section 25133, it is unlawful for any person without the written consent of the Corporations Commissioner to consummate the transfer of securities subject to a legend condition requiring such consent. Section 25503 provides that any person who transfers securities in violation of section 25133 shall be liable to the transferee who may tender the securities to the seller and sue to recover the consideration paid plus interest or damages and less any income received on the stock. Such suit must be instituted within two years of the illegal transfer. Cal. Corp. Code sec. 25507. Under the foregoing provisions of California law, it would appear that a sale or transfer of stock in violation of *658 section 25133 is effective unless and until rescinded by the purchaser. Respondent states in his brief that under former Cal. Corp. Code section 26100 transactions in violation of the corporate securities laws were deemed void, thus entitling the purchaser to rescission. He cites Pyle v. Shipman,251 Cal. App. 2d 913, 60 Cal. Rptr. 46 (1967); Taormina v. Antelope Min. Corp.,110 Cal. App. 2d 314, 242 P.2d 665 (1952); and Malik v. Universal Resources Corp.,425 F. Supp. 350 (S.D. Cal. 1976). Closer inspection of these authorities reveals that respondent's statement is overly broad. Section 26100 related only to securities sold by their issuer without a permit from the Corporations Commissioner, providing that "[e]very security of its own issue sold * * * without a permit of the Commissioner then in effect authorizing the * * * sale of the security is void." Pyle,supra, merely quotes this provision. 60 Cal. Rptr. at 48. Taormina,supra, provides that "the purchaser of securities issued in violation of the Corporate Securities Law may recover in an action for money had and *659 received on the theory that the sale and the securities are void, Pollak v. Staunton, * * * 293 P. 26 * * *." 242 P.2d at 668. Pollak v. Staunton,210 Cal. 656, 293 P. 26 (1930) also merely cited and paraphrased the statutory language, stating that "Where stock has been issued without a permit it is void by terms of the act * * * and the purchaser * * * may recover payments made by him on account of the purchase price." 293 P. at 29. It is interesting that the court also stated that "a natural person owning securities of which he is not the issuer or underwriter may sell such securities for his own account without * * * a permit * * *." 293 P. at 27. Thus, it is clear that section 26100, when it was in effect, applied only to sales of securities by their issuers without a permit from the Corporations Commissioner and not to "any transactions" of securities. Further, as respondent himself concedes, section 26100 was repealed in 1968. No comparable provision now exists explicitly characterizing a sale or transfer of securities as "void." It would seem that the cases discussed above which merely cite, quote, or *660 paraphrase section 26100 can have no more force and effect than the statute itself. It is also noteworthy that section 25133 was enacted following the repeal of section 26100 so that the latter would never have applied to the former. Respondent appears to argue, however, that since the remedies for violation of section 25133 are the same as they were under section 26100 for violation of issuer permit requirements (i.e., rescission and recovery of payments made), the legal status of the non-complying sale must also be the same (i.e., the sale is "void"), and accordingly should not be recognized for purposes of Federal taxation. We disagree with respondent's conclusions for two reasons. First, respondent seems to overlook the fact that section 26100 was repealed and that its language deeming as "void" a stock issuance and sale in violation of permit requirements was not replaced with any similar provision. Indeed, as the court in Malik v. Universal Resources Corp.,supra at 361, stated: "Sales of securities prior to January 2, 1969 sans permit or in violation of the terms of a permit are deemed void by law * * *." [Emphasis added], citing section 26100. *661 Thus, it is not at all clear that post-1968 sales of securities in violation of any provision of the California Securities laws are "void." Second, assuming arguendo that the term "void" would still apply to sales in violation of such provisions, it is the term's operative legal effect, rather than the term itself, which is relevant to our inquiry. Respondent apparently believes that once a stock sale can be labeled as "void" for purposes of California securities law, it is not to be recognized for any other purpose, including the Federal tax laws. From reading the cases cited above, we conclude that it is not at all clear that the word "void" possesses the near-talismanic significance which respondent reads into it. The term "void" meant simply that a buyer of improperly issued securities could, if he chose, rescind the sale and recover any consideration paid. However, it appears (and respondent has cited us to no contrary authority) that a buyer could also opt to retain his or her stock rather than suing for consideration paid. In that event we see no reason why, for Federal tax purposes, the sale should not be recognized as effective to pass title. This is emphatically *662 true under post-1968 provisions. Cal. Corp. Code section 25503 provides: Any person who violates * * * sec. 25133 * * * shall be liable to any person acquiring from him the security sold in violation of such section, who may sue to recover the consideration he paid * * * with interest * * * less the amount of any income received therefrom, upon the tender of such security * * * [Emphasis added]. Thus, the remedial action is optional and contemplates that a buyer may retain the stock and "receive income therefrom" in lieu of seeking rescission. In the instant case, Gunlock Corporation adopted exactly this course of action. It chose to retain its Wilshire Gardens' stock rather than suing for rescission--indeed, as it was never required to make any payments for the stock due to Wilshire Gardens' impecunious circumstances, there was never anything to sue for. [2] Thus, we hold that the transfer of stock on January 12, 1973, was effective to vest ownership of the Wilshire Gardens' stock in Gunlock Corporation. *663 Resondent further argues that, even if such transfer were valid, Mr. Gunlock continued to act as the 100-percent owner of Wilshire Gardens and was, therefore, its owner in substance.It is true that subsequent actions of Messrs. Henslee and Gunlock were superficially inconsistent with Gunlock Corporation's ownership of Wilshire Gardens' stock. Each of these inconsistencies has been adequately explained, however, by the credible testimony of the parties involved, as detailed supra at 7-9. We therefore hold that Gunlock Corporation became the 100-percent owner of Wilshire Gardens in January, 1973, and was accordingly entitled to file consolidated returns with that corporation for taxable years 1973, 1974, and 1975. Issue 2. Brother-Sister Corporation
The family relationships between Theodore Gunlock, Jane Olah, and Harold Harkness, as well as their direct ownership of Dexol stock, are set out supra at 10-11. Section 1561(a), as in effect during 1974 and 1975, restricted the component members of a controlled group of corporations as of a given December 31 to one surtax exemption for their taxable years which included such December 31. Section 1563 provides as *664 follows: SEC. 1563. DEFINITIONS AND SPECIAL RULES. [Sec. 1563(a)] (a) CONTROLLED GROUP OF CORPORATIONS.--For purposes of this part, the term "controlled group of corporations" means any group of-- (2) BROTHER-SISTER CONTROLLED GROUP.--Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing-- (A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and (B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation. Under section 1563(d) and (e), "stock owned" by a noncorporate person includes stock owned both directly and indirectly through the operation of the attribution rules of subsection (e). Respondent concedes that these rules do not apply to *665 make Mr. Gunlock's wife, Ruth, Jane Olah, or Harold Harkness the owners of any of Gunlock Corporation's stock. Thus, we need deal only with the direct ownership of Gunlock Corporation and Dexol stock set forth supra at 10-11. It is by now well- (if not long-) settled that each of the five or fewer noncorporate persons mentioned in section 1563(a)(2) must possess stock in each corporation in order to satisfy the "80-percent test" of section 1563(a)(2)(A). United States v. Vogel Fertilizer Company, 455 U.S.    , ( Jan. 13, 1982, 49 AFTR 2d 82-491, 82-1 USTC par. 9134). See also B & M Investors Corporation v. Commissioner, 78 T.C.     (Jan 29, 1982). Because neither Jane Olah nor Harold Harkness owned any stock in Gunlock Corporation, and hence did not own stock in both Dexol andGunlock Corporation, they may not be included in the five or fewer group. Only Mr. Gunlock may be so included. He owned 100 percent of Gunlock Corporation stock, but less than 70 percent of Dexol stock at the relevant times. Because he did not own at least 80 percent of the stock of each corporation, the 80 percent test of section 1563(a)(2)(A) was not satisfied. *666 Hence, Dexol and Gunlock Corporations were not members of a "controlled group" for purposes of section 1561(a) and were not required to share surtax exemptions for their taxable years 1974 and 1975. To reflect the foregoing, Decisions will be entered for the petitioners in both dockets.
Footnotes
1. All section references are, unless otherwise specified, to the Internal Revenue Code of 1954, as amended.↩
2. We note that two-year period of limitations prescribed by Cal. Corp. Code sec. 25507 for enforcing the sec. 25503 action for rescission expired on January 12, 1975. Indeed, as Gunlock Corporation was at all times 100 percent owned by Mr. Gunlock, there was no possibility that it would sue for rescission or damages. More generally, it is obvious that the prophylactic policy underlying the securities laws (i.e., to protect innocent third-party buyers) is not implicated to any extent in a transfer between an individual and his wholly owned corporation. The maxim cessanterationelegis,cessatetipsalex↩ has no clearer application than to the instant facts.